372 A.2d 826
**COMMONWEALTH of Pennsylvania**
v.
**Windmark MITCHELL, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 20, 1977.

Decided April 28, 1977.

554

■■■■■■■■■■■■■■■■■■

---

Shuman, Lawler & Levy, Arthur R. Shuman, Jr., Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., James A. Shellenberger, Philadelphia, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

On July 6, 1975, James Fulton was fatally shot during the course of a robbery in a private residence at 3135 West Arizona Street, Philadelphia. On the same day, a criminal complaint, charging Windmark Mitchell with murder, robbery, and related offenses, was filed, and a warrant for Mitchell's arrest issued. On November 19, 1975, Mitchell was arrested. A preliminary hearing was held on November 20, 1975. On March 22, 1976, pretrial motions and an application to dismiss the charges pursuant to Pa.R.Crim.P. 1100(f) were filed. A hearing on the application to dismiss was held on March 31 and April 1, 1976 in the Court of Common Pleas of Philadelphia.[1]

The hearing court denied the motion on April 15, 1976. On April 19, 1976, pursuant to the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, No. 223, Art. V, § 501, 17 P.S. § 211.501(b) (Supp.1976–77), the court certified the order as involving "a controlling question of law as to which there is substantial ground for

---

1. By agreement, the testimony of Detective McGurk at a separate hearing on the pretrial motions was incorporated as part of the record on the motion to dismiss.

difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter . . . ." Mitchell filed a petition for allowance of appeal and the Commonwealth filed an answer to the petition stating it had no objection to granting the petition. On June 26, 1976, we granted the petition. The appeal was filed on June 30, 1976.

The initial issue presented is at what point does the mandatory period in which to commence trial under Pa. R.Crim.P. 1100 begin to run. Section (a)(2) of Rule 1100 provides:

"Trial in a court case in which a written complaint is filed against the defendant . . . shall commence no later than one hundred eighty (180) days *from the date on which the complaint is filed*." [Emphasis added.]

Thus, in terms of the Rule, the issue is when is a complaint deemed filed.

██ The Comment to Rule 1100 states that a complaint for purposes of the Rule "includes special documents used in lieu of a complaint *to initiate criminal proceedings* in extraordinary circumstances . . . ." [Emphasis added]. Thus, it is clear that Rule 1100 contemplates the commencement of the running of the mandatory period at the point criminal proceedings are initiated.

██ Pa.R.Crim.P. 101 states, *inter alia*, that criminal proceedings are instituted by a written complaint. Thus, in the situation where a complaint is presented to a court and a warrant issued, the criminal proceedings begin with the presentation of the complaint to the court, and thus, for purposes of Rule 1100, the complaint is deemed filed and the mandatory period commences running with the presentation.[2] Therefore, the mandatory

2. In the situation where a warrantless arrest is made and the complaint is presented to the court after the arrest at the preliminary arraignment, see Pa.R.Crim.P. 130, the criminal proceedings

period instantly commenced running on July 6, 1975, when the complaint was presented or filed.

In support of its position that, in the situation of an arrest pursuant to a warrant, the complaint should be deemed filed as of the preliminary arraignment, the Commonwealth advances numerous arguments.

First, it argues that to rule otherwise will deter police from filing the complaint and obtaining a warrant since by arresting an accused without a warrant the mandatory period will not commence running until the preliminary arraignment. See n. 1 supra. We do not believe any meaningful deterrent to filing a complaint and obtaining a warrant will be created by our ruling. Section (d) of Pa.R.Crim.P. 1100 provides in part:

"In determining the period for commencement of trial, there shall be excluded therefrom such period of delay . . . as results from:

(1) the unavailability of the defendant . . .."

Thus, while the period will begin to run sooner where a complaint is filed and a warrant obtained prior to arrest, delay caused by the accused's unavailability is excluded. Therefore, though computed differently, the resultant mandatory period will in most instances be equal whether the arrest precedes or follows the filing of a complaint because of Section (d)(1).

The Commonwealth recognizes the equalizing effect of Section (d)(1) but argues that, since the Comment to Rule 1100 states:

". . . in addition to any other circumstances precluding the availability of the defendant . . ., the defendant should be deemed unavailable for any period of time during which he could not be appre-

under Pa.R.Crim.P. 101 begin with the arrest. We need not now decide if, in that situation, the arrest or the presentment of the complaint to a court at the preliminary arraignment pursuant to Pa.R.Crim.P. 130 shall commence the mandatory period of Rule 1100 running.

hended because his whereabouts were unknown *and could not be determined by due diligence* . . .."
[Emphasis added.]

Section (d)(1) requires a showing of due diligence in order for the Commonwealth to avail itself of an exclusion. This requirement, reasons the Commonwealth, does not exist if the arrest is made without a warrant, and thus a deterrent to obtaining a warrant exists despite Section (d)(1).

■■ We cannot agree that such a minimal requirement will create any meaningful deterrent to obtaining a warrant. The police can be expected to act with due diligence in locating and apprehending an accused in all situations because it is their duty to do so as public officials. Furthermore, while the exercise of diligence or the lack of it will not be monitored by Rule 1100 where a warrantless arrest is involved, but will be monitored where an arrest is made pursuant to a warrant, the distinction is justified. In the situation of an arrest pursuant to a warrant, the complaint is filed prior to arrest, and thus considerations such as disruption of employment, curtailment of associations, subjection to public obloquy, and creation of anxiety, *Commonwealth v. Hamilton*, 449 Pa. 297, 297 A.2d 127 (1972); *Commonwealth v. Silver*, 238 Pa.Super. 221, 357 A.2d 612 (1976), are brought to bear prior to arrest. On the other hand, in the situation of a warrantless arrest, these same considerations do not arise until the time of arrest. Since some of the considerations underlying the right of a speedy trial are present in the former situation and not present in the latter, the monitoring of delay under Rule 1100 is justified in the former situation and unnecessary in the latter.

■ Second, the Commonwealth argues that requiring a showing of due diligence in locating and apprehending an accused following the filing of a complaint will place

an undue burden on the various district attorneys' offices because they will be required to monitor police efforts in effectuating an arrest. Since the police can be expected to exercise due diligence in carrying out their public function, we consider this "burden" to be either nonexistent or so slight that, considering the accused's interests, it is certainly warranted.

Third, the Commonwealth argues that certain language in *Commonwealth v. Shelton*, 469 Pa. 8, 364 A.2d 694, 698 (1976), supports its position, namely:

"The 'Commonwealth' in the context of the Rule clearly refers to prosecutorial officers and not to the judiciary."

Based on this language, the Commonwealth reasons that Rule 1100 addresses itself to prosecutorial officers and not police. Thus, the Commonwealth would have us rule that the mandatory period begins to run from the time of preliminary arraignment where an arrest is made pursuant to a warrant because otherwise we would be interpreting the Rule as addressing itself to police.

The argument is devoid of merit. When the police file a complaint they initiate criminal proceedings against an accused, Pa.R.Crim.P. 101, and thus are clearly prosecutorial officers.

Fourth, the Commonwealth argues that ruling the complaint is deemed filed when presented to a court prior to arrest will result in the Commonwealth running the risk of dismissal in numerous cases because the determination of whether the Commonwealth may obtain an exclusion pursuant to Section (d)(1) is made after an application to dismiss is filed. *Commonwealth v. Shelton*, supra at 18–19, 364 A.2d at 699. We do not believe any unwarranted risks are created by our ruling. The Commonwealth need only show unavailability of the accused and due diligence on the part of police in executing the warrant. The risk of dismissal is justified by the ac-

cused's right to a speedy trial, and can be avoided by due diligence.[3] See generally *Commonwealth v. O'Shea*, 465 Pa. 491, 350 A.2d 872 (1976).

Accordingly, we hold that a complaint is filed and the mandatory period in which to commence trial begins to run pursuant to Rule 1100 when the complaint is presented to a court in the situation where the complaint precedes arrest. See generally *Commonwealth v. Silver*, supra. Thus, instantly, the mandatory period commenced running on July 6, 1975.

■■■ Since the application to dismiss was filed on March 22, 1976, or 260 days after the mandatory period began to run, since Section (a)(2) mandated the commencement of trial within 180 days from July 6, and since no extensions pursuant to Section (c) were sought, the Commonwealth was required to show that at least 81 days should have been excluded pursuant to Section (d) to avoid dismissal.[4]

The period of time the Commonwealth sought to exclude involves the period between the filing of the complaint on July 6 and arrest on November 19, 1975, or one hundred and thirty-six days. Mitchell now concedes that from October 29 until November 19, 1975, the Commonwealth exercised due diligence. Thus, the disputed period involves July 6 until October 29, 1975 or 115 days. The Commonwealth sought to exclude this 115-day period pursuant to Section (d)(1) by showing Mitchell was

3. The Commonwealth advances other arguments in support of its position but as with those discussed in the text, we do not consider them persuasive.

4. Mitchell's assertion that allowing the Commonwealth to show circumstances warranting an exclusion pursuant to Section (d) in effect allows the Commonwealth to obtain an extension pursuant to Section (c) *nunc pro tunc* in violation of our rulings in *Commonwealth v. Woods*, 461 Pa. 255, 336 A.2d 273 (1975) and *Commonwealth v. O'Shea*, supra, is devoid of merit because it fails to recognize that Section (d) does not allow an extension; rather, it excludes periods of delay for which the accused and/or his attorney should be deemed responsible.

unavailable because he avoided arrest. As mentioned earlier, the Comment makes clear that under such circumstances the Commonwealth was required to show that Mitchell's whereabouts were unknown and that due diligence was utilized by the police in attempting to determine his whereabouts. The hearing court found that due diligence was exercised during this period.

Initially, we rule that the Commonwealth has the burden of proving the requisites of Section (d) in order to avail itself of an exclusion and must do so by a preponderance of the evidence.[5] Compare *Commonwealth v. Ewell*, 456 Pa. 589, 319 A.2d 153 (1974). Furthermore, in reviewing a hearing court's ruling that the Commonwealth has met its burden, we shall consider only the evidence presented by the Commonwealth and so much evidence as presented by the defense as, fairly read in the context of the record as a whole, remains uncontradicted. See *Commonwealth v. Smith*, 470 Pa. 219, 368 A.2d 272 (1977); *Commonwealth v. Johnson*, 467 Pa. 146, 354 A.2d 886 (1976).

So viewed, the record establishes the following:

At the time of the crimes, Mitchell resided with his mother. His wife did not reside with him; rather, she resided with her mother. After the crimes, Mitchell abandoned his mother's residence and for approximately one month lived at two different residences. In August of 1975, Mitchell and his wife began to reside together in an apartment rented by Mitchell under a different name, Herbert Nash.

Detective McGurk, who had been assigned to the case, went to Mitchell's mother's residence some six or eight times in an attempt to locate him. McGurk also testified

5. Since a preponderance requirement is the least demanding standard known to the law, we can assume the hearing court's determinations that the Commonwealth showed Mitchell's whereabouts were unknown and the Commonwealth exercised due diligence in locating him were made in accordance with this standard.

that he had learned the address from police records of a prior arrest of Mitchell; that on each occasion he spoke with Mitchell's mother; that on one occasion Mitchell's mother provided the general location of Mitchell's wife's residence; that he went to the general location but was unable to ascertain her exact address; and, that he spoke with Mitchell's parole officer, who, at the time he spoke to McGurk, indicated only that Mitchell might surrender himself. Finally, McGurk distributed photographs of Mitchell to police officers in the Philadelphia Police Department.

Mitchell argues that such efforts do not constitute due diligence. In support of this argument, Mitchell relies on certain evidence which established the following:

Detective McGurk apparently became ill and was soon to retire. As a result on October 29, 1975, Detective Lyons replaced him. Lyons received a phone call from Mitchell's parole officer on October 29 and was informed that Mitchell was receiving public assistance benefits. Lyons then arranged to be present when Mitchell picked up his check at a bank. On November 19, 1975, Mitchell was apprehended pursuant to Lyons' arrangements. Furthermore, Mitchell relies on these facts: that he was receiving such checks for the entire period during which police were attempting to locate him; that he picked up the checks regularly from July 18, 1975 until arrested; and, that he was employed under his own name from October 9, 1975 until arrested.

From these facts, Mitchell reasons that McGurk should have contacted the Department of Public Assistance and apprehended Mitchell on July 19, 1975, or the first day on which Mitchell picked up a check following the issuance of the warrant. The error in such reasoning is that nothing in the record indicates that the police had any indication prior to October 29 that Mitchell was obtaining public assistance. Further, Mitchell did not become employed until October 9, 1975 and the police had no reason to know he had obtained such employment and no di-

rect connection with the employer by which to learn that fact. Finally, when arrested, Mitchell had in his possession a social security card bearing the name Herbert Nash and he remarked, "How did you find me? I never thought you would catch me." Clearly such evidence is sufficient to permit the inference that Mitchell actively concealed his whereabouts when considered with the fact that he rented an apartment under the name Nash.

 It is not the function of our courts to second-guess the methods used by police to locate accused persons. The analysis to be employed is whether, considering the information available to the police, they have acted with diligence in attempting to locate the accused. Deference must be afforded the police officer's judgment as to which avenues of approach will be fruitful. Instantly, McGurk knew an address, which information he pursued on numerous occasions, and he had a photograph of Mitchell, which he circulated within the police department. McGurk chose certain avenues of approach to locate Mitchell and pursued those avenues. In this context, such action warranted a conclusion of due diligence.[6]

Thus, we agree with the hearing court that the period between July 6 and November 19 should be excluded from the computation of the mandatory period in which to commence trial. Since exclusion of that 136-day period results in the application for dismissal having been filed after only 124 days of the allowable 180 days passed, the application was properly denied.

Order affirmed.

JONES, former C. J., did not participate in the consideration or decision of this case.

6. We are asked to adopt a standard similar to that used to determine if a witness "cannot be found" under the Act of May 23, 1887, P.L. 158, § 3, 19 P.S. § 582. We decline to do so. A witness is far less likely to be avoiding officials than an accused.