464 A.2d 1376

**COMMONWEALTH of Pennsylvania**

v.

**Donald Scott ALEXANDER, Appellant.**

Superior Court of Pennsylvania.

Submitted April 27, 1983.

Filed Aug. 26, 1983.

---

346

John H. Corbett, Jr., Public Defender, Pittsburgh, for appellant.

Robert L. Eberhardt, Deputy District Attorney, Pittsburgh, for Com., appellee.

Before ROWLEY, POPOVICH and HOFFMAN, JJ.

POPOVICH, Judge:

This is an appeal from the judgment of sentence for Rape (18 Pa.C.S.A. § 3121(1)) and Criminal Conspiracy (18 Pa.C. S.A. § 903(a)(1)) entered by the Court of Common Pleas of Allegheny County.

On appeal, appellant, Donald Scott Alexander, asserts that: 1) the Commonwealth failed to exercise "due diligence" in bringing him to trial within the 180-day period mandated by Pa.R.Crim.P. 1100; and 2) the evidence was insufficient to support his conviction for Criminal Conspiracy. We are constrained to agree with the first point proffered by the appellant; accordingly, we reverse the judgment of sentence.

Because of the result we reach in the case at bar, we need only concern ourselves with the Rule 1100 issue. The facts in regard thereto consist of the following: A complaint was filed against the appellant on March 21, 1979. Shortly thereafter, the officers in charge of locating the accused spoke to him by phone and were assured that he intended to turn himself in, but he did not do so. As a result, on April 17, 1979, the police went before a magistrate to establish that appellant could not be found despite their diligent search. Also, appellant's vital facts were placed with the National Crime Information Center (N.C.I.C.) by Allegheny County authorities. This was succeeded by the court granting the Commonwealth's Pa.R.Crim.P. 231 petition on June

18, 1979, i.e., the filing of an Information without the requirement of a preliminary hearing.

Sergeant Warren Broz, of the Pittsburgh police, testified that on January 16, 1980 he received a call that appellant was incarcerated in New Jersey.[1] This information, in turn, was relayed to the assistant district attorney (Michael F. Dalfonso, Jr.) in charge of all matters involving extradition, detainers and writs of habeas corpus for the District Attorney's Office of Allegheny County on or about January 21, 1980. (N.T. 1/14/81 at 12) This caused the assistant district attorney to phone New Jersey authorities, who told him that appellant had charges pending against him in that State. Thereafter, on January 23, 1980, the assistant district attorney secured and sent a bench warrant for appellant's arrest.

On March 20, 1980, the assistant district attorney received a letter from the Deputy Attorney General of New Jersey telling him appellant "had been sentenced." (N.T. 1/14/81 at 29) A certified copy of appellant's conviction was enclosed and revealed that he had been sentenced on February 27, 1980. This prompted Assistant District Attorney Dalfonso, on March 27, 1980, to write to the State Correctional Institution in Yardville, New Jersey requesting temporary custody of the appellant pursuant to the Agreement on Detainers Act.[2] (Detainers Act) Enclosed in the mail was "form five," which was a "[r]equest for temporary custody [of the appellant] for purposes of trial on charges of rape." (N.T. 1/14/81 at 14) The correctional institution and appellant each received a "form five." (N.T. 1/14/81 at 15) Normally, as testified to by the assistant district attorney and not contested by the defense, "there is a 30-day

1. On cross-examination, Sergeant Broz admitted that Pittsburgh police are "privy" to the data contained in the N.C.I.C. computer. (N.T. 1/14/81 at 8) However, he could not say for sure that they were cognizant of the information relating to appellant's earlier arrest in September of 1979 in New Jersey.

2. The Act of July 9, 1976, P.L. 586, No. 142, § 2, effective June 27, 1978; 42 Pa.C.S.A. § 9101 et seq. Pennsylvania and New Jersey are signators to the interstate agreement on detainers.

waiting period from the time the defendant is served a copy of form five[,]" (N.T. 1/14/81 at 14–15), to afford the accused the opportunity to object to the receiving state's (in this case Pennsylvania's) petition for custody with the sending state's (in this case New Jersey's) Governor.[3] *See* 42 Pa.C.S.A. § 9101 (Art. IV(a)). The assistant district attorney went on to state that it was customary to tack on 10 days to the original 30-day period, given the facts at bar, to allow for the time consumed in the pick up and delivery of the mail. (N.T. 1/14/81 at 28–29) The reason for adhering to such a time stricture ("rule of thumb" time table), according to the witness, is to avoid unnecessary communication with the sending state's officials prior to the expiration of the statutorily created appeal period. Thus, if everything had gone properly, the assistant district attorney opined that the next date he should have heard from New Jersey "would [have been] ... sometime early [in] May" of 1980. (N.T. 1/14/81 at 15)

However, the assistant district attorney did not act until July 10, 1980, at which time he phoned Yardville State Correctional Institution concerning the accused and was advised that he "had been transferred to Rahway State Correctional Institution in New Jersey ...." (N.T. 1/14/81 at 17, 35 and 36) This caused the assistant district attorney to send a letter to a Ms. Fruscello on July 10, 1980, who was in charge of "classification" at Rahway State Prison, requesting temporary custody of the appellant by means of "a new form five." (N.T. 1/14/81 at 18) The next contact the assistant district attorney had with Rahway was when he called Ms. Fruscello on September 16, 1980. The assistant district attorney was informed that the original "form five" sent to Yardville "had been misplaced in the transfer" of the appellant to Rahway. (N.T. 1/14/81 at 35–36) As for

3. After the passage of approximately 30 to 40 days, if appellant had appealed to the Governor of New Jersey from Pennsylvania's request for temporary custody, the assistant district attorney would have received "forms three and four." The former deals with "Delivery of Temporary Custody" and the latter concerns a "Certificate of Status." He received neither from the officials at Yardville State Correctional Institution. (N.T. 1/14/81 at 15)

the reason why the officials at Rahway did not act on the "new form five," Ms. Fruscello advised the assistant district attorney that "she was on vacation for the [previous] three weeks and no one did her work. She assured [him] she would get on this matter immediately. [However, t]he next communication [the assistant district attorney] received was a telephone call from Detective Scott from [a New Jersey] County Prosecutor's Office on October 23, 1980. He advised [the assistant district attorney] that the defendant was on the street. He knew where he was. He wanted to know if [the assistant district attorney] still wanted him." (N.T. 1/14/81 at 19)

In response to Detective Scott's call, the assistant district attorney sent a teletype via N.C.I.C. on October 23, 1980 informing Scott that appellant was still wanted and he would extradite if the detective apprehended him. After the assistant district attorney was notified by Detective Scott that appellant was in custody and had waived extradition, Dalfonso prepared an order of court the next day, October 31, 1980, directing the Sheriff's Office of Allegheny County to return appellant to this Commonwealth.[4] On

---

**4.** Our review of the record, which includes the *second* Rule 1100 hearing held on April 30, 1981, indicates that appellant plead guilty to burglary in New Jersey, was sentenced to a term of 4 years and paroled on October 28, 1980. (N.T. 1/14/80 at 58 & 65) (N.T. 4/30/81 at 7 & 25) Attorney Dalfonso denied having any knowledge that appellant was placed on parole. (N.T. 1/14/80 at 65) Had he known, "[o]nce [appellant] was paroled on the detainer, [he] would no longer [have] go[ne] on the detainer, but on extradition." (N.T. 1/14/80 at 59)

Appellant testified that after his release from Rahway on October 28th, he was transferred to Middlesex County Jail, New Brunswick, New Jersey for an extradition hearing. (N.T. 1/14/80 at 66) On October 30th, the extradition hearing was held and appellant told court officials in New Jersey that he "wanted to go back to Pennsylvania." (N.T. 1/14/80 at 67) (N.T. 4/30/81 at 27) Thereafter, appellant was picked up by Deputy Sheriffs of Allegheny County and transported back to Pennsylvania.

We find interesting the fact that the records, briefs and opinions reviewed by this Court all indicate that appellant was finally lodged in the Allegheny County Jail on November 6, 1980. However, there is no illumination as to what transpired between appellant's extradition hearing in New Jersey and his return to Pennsylvania on November

November 6, 1980, appellant was finally housed in the Allegheny County Jail. At this point, it requires mentioning that all that has been discussed relates directly to appellant's *first* Rule 1100 hearing held on January 14, 1981. By Opinion and Order dated February 12, 1981, the presiding judge "held that the defendant was unavailable for trial between March 21, 1979, and November 6, 1980. Therefore, defendant's trial date [was set for] May 4, 1981." (Lower Court Opinion at 5) Thereafter, on April 30, 1981, appellant's counsel filed a "Motion to Dismiss" (Motion) and a *second* Rule 1100 hearing was held to determine if "the defense ha[d] new evidence."

At the hearing, the only one of two witnesses (the other being the appellant), David R. Flick, supervisor of the Pennsylvania Board of Probation and Parole (Board), took the stand and remarked that the Board declared appellant delinquent on April 17, 1979 for not reporting to his parole officer. Consequently, the Board utilized N.C.I.C. to alert law enforcement officials that appellant was wanted. By transcription over the N.C.I.C. computer dated September 29, 1979, the Board was informed that appellant was "apprehended by police [in] Little Falls, New Jersey[.]" (N.T. 4/30/81 at 9) On October 2, 1979, the Board transmitted a detainer on Donald Alexander to New Jersey by means of N.C.I.C.

On April 21, 1980, New Jersey officials sent to Mr. Flick's office in Harrisburg, which deals directly with matters concerning out-of-state clients of the Board, a report disclosing that appellant had been arrested (September 28, 1979), pleaded guilty (burglary), sentenced (4 years) and was in custody (county jail). However, as to this transmission, Mr. Flick "couldn't answer ... for sure" that the Pittsburgh police had been similarly advised. (N.T. 4/30/81 at 9)

This scenario continues with the Board receiving a letter dated June 13, 1980 from Rahway State Prison advising it

6th. Appellant does not question the propriety of this hiatus, thus we need not consider it.

that a warrant for outstanding charges in Allegheny County against the appellant was on file with the institution. The next, and last, communication was dated November 21, 1980, and was in response to the Board's inquiry about the appellant as of November 5th. The personnel at Rahway informed the Board that as of October 28, 1980, appellant was released to his Pennsylvania detainer and was picked up by Middlesex County Court, New Jersey. (N.T. 4/30/81 at 5) The events testified to after the last communique were consistent with those at the *first* Rule 1100 hearing. Subsequent thereto, by Order dated May 1, 1981, the court denied appellant's Motion.

The aftermath of the preceding Order was appellant's trial on May 4, 1981, resulting in conviction, followed by the denial of post-trial motions and the imposition of sentence. A motion for reconsideration of sentence was denied, but no appeal was taken therefrom. Rather, appellant's appellate rights were reinstated *nunc pro tunc* after the trial court reviewed appellant's Post-Conviction Hearing Act petition (19 P.S. § 1180–1 *et seq.*) and found he had not waived his appellate rights. This appeal followed.

For ease of discussion, it is appropriate to identify the period of time with which this Court will not be concerned with in addressing the Rule 1100 claim. To-wit, the period after appellant's return to the Commonwealth on November 6, 1980 is not questioned. (*See* Appellant's Brief at 11–20)

The issue on appeal is framed by appellant's counsel as follows:

Donald Scott Alexander ... was improperly tried ... beyond the mandatory one hundred & eighty (180) day period of Rule 1100. The fact that Mr. Alexander was incarcerated in another jurisdiction during this time did not affect the Commonwealth's duty to exercise due diligence to secure either the return of Mr. Alexander or a proper extension of time. The Commonwealth failed in its duty, and, therefore, Mr. Alexander's conviction may not stand. (Appellant's Brief at 11)

To start with, Pa.R.Crim.P. 1100(a)(2) provides that: "[t]rial in a court case in which a written complaint is filed against the defendant after June 30, 1974 shall commence no later than one hundred eighty (180) days from the date on which the complaint is filed." As mentioned previously, a criminal complaint was filed against appellant on March 21, 1979. Thus, the initial run date was September 17, 1979. *See Commonwealth v. Walls*, 303 Pa.Super. 284, 449 A.2d 690 (1982); 1 Pa.C.S.A. § 1908. Trial occurred on May 4, 1981. Therefore, unless 414 days (the time span between the issuance of the complaint and appellant's return to the Commonwealth) are excluded from the tabulation of the run date under Rule 1100(d)[5] or justified by an extension of the run date granted under section (c) of the Rule,[6] appellant's convictions must be reversed. Since the Commonwealth filed no petition to extend, we are left with a determination of whether appellant's absence from the Commonwealth is *automatically* excludable under Rule 1100(d). *Commonwealth v. Long*, 258 Pa.Super. 251, 392 A.2d 779 (1978).

As this Court wrote in *Commonwealth v. Warman*, 260 Pa.Super. 130, 135–136, 393 A.2d 1046, 1049 (1978):

5. Rule 1100(d) provides:
 In determining the period for commencement of trial, there shall be excluded therefrom such period of delay at any stage of the proceedings as results from:
 (1) the unavailability of the defendant or his attorney;
 (2) any continuance in excess of thirty (30) days granted at the request of the defendant or his attorney, provided that only the period beyond the thirtieth (30th) day shall be so excluded;

6. Section (c) of Rule 1100 provides:
 At any time prior to the expiration of the period for commencement of trial, the attorney for the Commonwealth may apply to the court for an order extending the time for commencement of trial. A copy of such application shall be served upon the defendant through his attorney, if any, and the defendant shall also have the right to be heard thereon. Such application shall be granted only if trial cannot be commenced within the prescribed period despite due diligence by the Commonwealth. Any order granting such application shall specify the date or period within which trial shall be commenced.

Mere incarceration in another jurisdiction does not make appellant unavailable. Appellant will be considered unavailable only for the period of time during which his presence could not be secured despite due diligence by the Commonwealth. *Commonwealth v. Richbourgh*, 246 Pa. Super. 300, 369 A.2d 1331 (1977); *Commonwealth v. Kovacs*, 250 Pa.Super. 66, 378 A.2d 455 (1977). "There is no question, therefore, that the duty imposed on the Commonwealth by Rule 1100 to bring a defendant to trial within the prescribed period is not affected by the fact of his incarceration elsewhere ...." *Commonwealth v. McCafferty*, 242 Pa.Super. 218, 224, 363 A.2d 1239, 1241 (1976).

Additionally, on this subject of whether an accused in the custody of another jurisdiction renders him unavailable for trial, the *Comment* to Rule 1100(d)(1) reads:

For purposes of subparagraph (d)(1), in addition to any other circumstances precluding the availability of the defendant or his attorney, the defendant should be deemed unavailable for any period of time during which he could not be apprehended because his whereabouts were unknown and could not be determined by due diligence; or *during which he contested extradition, or a responding jurisdiction delayed or refused to grant extradition;* or during which the defendant was physically or mentally incompetent to proceed; or during which the defendant was absent under compulsory process requiring his appearance elsewhere in connection with other judicial proceedings. (Emphasis added)

*See Commonwealth v. Porter*, 251 Pa.Super. 346, 380 A.2d 812 (1977) (Both our Supreme Court and this Court previously have employed the *Comments* in interpreting the Rules).

██ Having set forth a framework within which to evaluate the Rule 1100 issue, we can now turn to the first of appellant's arguments, which questions the logic of the Commonwealth failing to proceed under the Extradition

Act[7] after it learned of his whereabouts on January 22, 1980.

Assistant District Attorney Dalfonso testified that once appellant was located, he forwarded a bench warrant to New Jersey on January 23, 1980. It was Dalfonso's belief that he "couldn't proceed under extradition because of local charges pending. [He] couldn't file ... form five, [a] request for temporary custody under [the] agreement on detainers, because [appellant] wasn't as yet a sentenced prisoner." (N.T. 1/14/81 at 13) In other words, Dalfonso was waiting to hear from New Jersey as to when appellant had been tried and sentenced "so [he] could determine which avenue to pursue." *Ibid.*

As to the latter point proffered by the Commonwealth's witness, we are in accord that the Detainers Act was an inappropriate mechanism, at least at that stage of the case, to seek appellant's return since it applies only "[w]hen[ ] a person has entered upon a term of imprisonment in a penal or correctional institution[.]" 42 Pa.C.S.A. § 9101 (Art. III(a)). *Accord Commonwealth v. Hude*, 483 Pa. 489, 397 A.2d 772 (1979); *Commonwealth v. Heath*, 288 Pa.Super. 119, 431 A.2d 317 (1981). However, we do not view the proposition contained in the former point in like fashion. The reason is evident from a perusal of subsection (a) of Section 9126 of the Extradition Act, which reads:

(a) Extradition from another state.—*When it is desired to have returned to this Commonwealth a person charged in this Commonwealth with a crime, and such person is imprisoned or is held under criminal proceedings then pending against him in another state, the Governor of this Commonwealth may agree with the executive authority of such other state for the extradition of such person before the conclusion of such proceedings or his term of sentence in such other state,* upon condition that such person be returned to such other state at the expense of this Commonwealth as soon as the

---

7. Act of 1976, July 9, P.L. 586, No. 142, § 2, effective June 27, 1978; 42 Pa.C.S.A. § 9121 *et seq.*

prosecution in this Commonwealth is terminated. (Emphasis added) 42 Pa.C.S.A. § 9126(a).

Although we acknowledge that the request for extradition under subsection (a) of Section 9126 is directory and not mandatory, this fact does not discount the availability of the Extradition Act as a means by which appellant's return could have been *initiated.* Extradition was the appropriate procedure for *commencing* securement of appellant's return to Pennsylvania prior to his conviction and sentencing in New Jersey. *See Wallace v. Hewitt,* 428 F.Supp. 39, 41 n. 6 (M.D.Pa.1976); *Commonwealth v. Heath, supra,* 288 Pa.Super. at 127–129, 431 A.2d at 321; *Commonwealth ex rel. Coleman v. Cuyler,* 261 Pa.Super. 274, 396 A.2d 394 (1978). The extradition proceedings could have been started on January 22, 1980, while appellant was incarcerated *awaiting trial* in the asylum state. *See Commonwealth v. Heath, supra.* The Commonwealth did not do so and attempts to excuse its (in)actions (e.g., filing of a bench warrant instead and waiting until March 20, 1980 to be notified by the Deputy Attorney General of New Jersey that appellant had been sentenced) by the following remarks:

> Because the appellant was not yet sentenced on the New Jersey charges, the District Attorney's Office, knowing that to proceed with extradition would be futile due to time constraints, awaited notification of sentencing. (Commonwealth's Brief at 4)

We regret that the Commonwealth neglected to give us the benefit of its insight as to what "time constraints" made extradition futile. Nonetheless, from our own assiduous review of the record and the law, we are able to discern that the only "time constraints" the Commonwealth could be referring to are those associated with the preparation (42 Pa.C.S.A. § 9144) and filing of the extradition documents with the necessary state officials. *Cf. Commonwealth v. Heath, supra,* 288 Pa.Super. at 126, 431 A.2d at 320 ("District Attorney of Blair County testified that he commenced proceedings under the Extradition Act by preparing the necessary documents within one or two days after the filing

of the criminal complaint on March 20, 1976. The extradition documents were forwarded to the Governor of Pennsylvania on April 2, 1976. Their receipt was acknowledged in a letter addressed to the district attorney from the Secretary of the Commonwealth of Pennsylvania dated April 8, 1976. The district attorney further testified that he was notified, by letter dated April 23, 1976, that the extradition documents had been received by authorities in Virginia."). Thus, the Commonwealth's argument would seem to be that *if* extradition had been initiated instead of a bench warrant, by the time the appropriate papers would have been received by New Jersey (some 30 to 40 days after January 22, 1980), appellant would have already been sentenced (February 27, 1980). As a result, the Extradition Act would have been ineffectual. We find that the Commonwealth's "time constraints" argument misses the mark, for it deals in hindsight. This type of abstract ("if-then") thinking was responded to quite aptly by this Court in *Commonwealth v. Williams*, 284 Pa.Super. 125, 425 A.2d 451 (1981), wherein we dealt with the contention that the Commonwealth did not use reasonable efforts in applying for custody of an accused under the Detainers Act in the following manner:

> [T]he test is *not* a venture into hindsight reasoning as to whether, if certain individuals had been contacted, or other things done, an arrest would probably have been made. The matters of availability and due diligence must be judged by what *was* done by the authorities rather than [by] what was not done. The standard of due diligence demands only reasonable efforts. (Citation omitted) (Emphasis in original)

*Id.*, 284 Pa.Superior Ct. at 132, 425 A.2d at 455. We think it abundantly clear that the Commonwealth did not use such reasonable efforts.

 We wish to make one other remark to the Commonwealth's assertion that the Extradition Act imposed "time constraints" that impeded the return of the out-of-state fugitive, and, consequently, warranted the delay in producing him for trial. "It is true that *if* the Commonwealth had followed the proper procedures for the [Extradition Act]

and *if* appellant or the [New Jersey] authorities had contested his transfer, the time so consumed would have been excluded from the period of Rule 1100. *Commonwealth v. McCafferty,* 242 Pa.Super. 218, 220, 363 A.2d 1239, 1240 (1976). Here, however, the Commonwealth did not begin the proper procedures [under the Extradition Act] ... and neither appellant nor the [New Jersey] authorities contested the Commonwealth's action. The Commonwealth, then, may not use appellant's incarceration in [New Jersey] as an excuse for failing to comply with Rule 1100. *Commonwealth v. Hamilton,* 449 Pa. 297, 300, 297 A.2d 127, 128–129 (1972); *Commonwealth v. McCafferty, supra."* *Commonwealth v. Porter, supra,* 251 Pa.Super. at 351, 380 A.2d at 815. Stated otherwise, had the appellant or New Jersey objected to extradition, the time expended in regard thereto would have been excluded from the period of Rule 1100. *See Commonwealth v. Bass,* 260 Pa.Super. 62, 393 A.2d 1012 (1978). Obviously, because the Commonwealth did not file such a request, the transfer could not be contested. Ergo, the period (of sixty-five days) between January 22, 1980 (when the Commonwealth became aware of appellant's whereabouts) and March 27, 1980 (when the Commonwealth submitted a request for the appellant under the Detainers Act with New Jersey) are not excludable.[8]

We could at this juncture dispense with any further discussion of the Rule 1100 issue since our finding precludes the Commonwealth from complying with the 180-day requirement. Notwithstanding this fact, we deem it appropriate, for the purpose of dispelling any doubts one may still harbor as to our ruling, to examine the Commonwealth's other efforts in seeking to bring appellant back to Pennsylvania.

■ As recited earlier, Assistant District Attorney Dalfonso took action on *March 27, 1980,* in the form of a letter

8. The figure is calculated by excluding the first day and adding the last. 1 Pa.C.S.A. § 1908. Also, although not dispositive of the case, we note that defense counsel stipulated to the exclusion of that period between the filing of the complaint (March 21, 1979) and the N.E.I. hearing before the district magistrate (April 17, 1979). (N.T. 1/14/81 at 3)

to prison officials at Yardville, New Jersey, seeking the return of the appellant under the Detainers Act. Dalfonso testified that the Detainers Act provides a prisoner with the opportunity to appeal his transfer to the Governor of the asylum state. *See* 42 Pa.C.S.A. § 9101 (Art. IV(a)). Furthermore, Dalfonso stated that it was acceptable practice to add 10 days on to the 30-day appeal period to allow for the time expended by the postal service in picking up and delivering the documents. Consequently, Dalfonso opined, if all had gone just as outlined, the date on which he should have been contacted by New Jersey would have been "sometime early May" of 1980. (N.T. 1/14/81 at 15)

Given Attorney Dalfonso's admitted familiarity with the time sequence attendant to the securement of an accused under the Detainers Act, we find his failure to act after the passage of May, June and the first part of July of 1980 without any information from New Jersey difficult to understand, and certainly not consonant with Rule 1100's "due diligence" standard. *See, e.g., Commonwealth v. McNeal,* 261 Pa.Super. 332, 396 A.2d 424 (1978) (7 months of inaction); *Commonwealth v. Kovacs,* 250 Pa.Super. 66, 378 A.2d 455 (1977) (8 months of inaction). In fact, Attorney Dalfonso did nothing until *July 10, 1980.* Then, he called Yardville State Correctional Institution and was told appellant had been transferred to Rahway.

Before proceeding, it must be mentioned that *no* evidence was presented to indicate that the Commonwealth's inaction was predicated upon assurances from New Jersey penal officials that the District Attorney's Office of Allegheny County would receive prompt notification upon appellant's becoming available. If such were the case, the result would be different. *See, e.g., Commonwealth v. Johnson,* 305 Pa.Super. 310, 451 A.2d 546 (1982); *Commonwealth v. Emmett,* 274 Pa.Super. 23, 417 A.2d 1232 (1979); *Commonwealth v. Warman, supra.*

In light of the aforesaid, even if we utilize Dalfonso's "rule of thumb" in calculating the reasonable period of time one should expect to wait before receiving a response from

an asylum state, if the Detainers Act is the vehicle by which an out-of-state defendant is being sought, the lapse of time is not insignificant. That is, the span of time between when Attorney Dalfonso "should have" received a response from New Jersey prison officials to his March 27, 1980 letter (i.e., "sometime early May" of 1980) and when he, in fact, did act after receiving no such response (by July 10, 1980) consists of some 60 days that are *unaccountable* for in terms of the "due diligence" standard.

■ The final Rule 1100 time period we will discuss runs from July 10, 1980 to September 16, 1980.

On *July 10, 1980,* after being informed of appellant's incarceration in Rahway by Yardville officials, Attorney Dalfonso wrote to a Ms. Fruscello at Rahway asking for custody of the appellant. The next conversation Attorney Dalfonso had with Rahway was when he called on *September 16, 1980* and was told that the original request ("form five") sent to Yardville had been misplaced in appellant's move to Rahway. What transpired thereafter is recounted *supra* and need not be reiterated to address the issue before us.

In dealing with the period in question, the previous analysis is equally applicable in exposing the Commonwealth's shortcomings. For instance, even allowing for the maximum 40-day grace period referred to by Attorney Dalfonso as an accepted period of time to wait before the "requesting state" need again contact the "sending state" under the Detainers Act, there is still a total of 26 days (66 days between July 10 to September 16, 1980 minus 40) during which *no* action was taken by the Commonwealth in seeking appellant's return.

■ The Commonwealth has failed to show by a preponderance of the evidence that sufficient action was pursued in an attempt to bring the absent defendant back for trial. *Commonwealth v. Mitchell,* 472 Pa. 553, 372 A.2d 826 (1977).

We find, therefore, that the Commonwealth's showing of "due diligence" was woefully insufficient. Without such a

showing, we are unable to find appellant "unavailable" under Rule 1100(d), because mere incarceration in another jurisdiction, in itself, does not prove unavailability. *See Commonwealth v. Bass, supra.*

The judgment of sentence is reversed and appellant is ordered discharged.

ROWLEY, J., files a concurring statement.

ROWLEY, Judge, concurring:

I reluctantly join in the Court's decision. This is, however, another prime example of the exaltation of a rule of procedure [Pa.R.Cr.P. 1100] to such a status that it affords an accused far greater benefits than do the underlying Constitutional provisions [U.S. Const., Amend. VI, and Pa. Const., Art. I, § 6] that the procedural rule was designed to implement; all at the expense of innocent victims and to the detriment of the law-abiding citizens of Pennsylvania. However, we, as an intermediate appellate court, have no authority, or right, to amend the Supreme Court's procedural rules or to overrule the decisions of that Court interpreting and applying its rules. Since those rules and decisions *mandate* that appellant be discharged because his trial was not commenced for 25½ months after the complaint was filed, I reluctantly concur in the Court's order.