J-A10021-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KARIM SUTTON | : | No. 1922 EDA 2024 |

Appeal from the Order Entered June 28, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001651-2024

BEFORE: PANELLA, P.J.E., BECK, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY BECK, J.: **FILED JUNE 20, 2025**

The Commonwealth appeals the order entered by the Philadelphia County Court of Common Pleas ("trial court") granting the motion to dismiss filed by Karim Sutton ("Sutton") pursuant to Rule 600 of the Pennsylvania Rules of Criminal Procedure.[1] Because the pre-arrest delay was caused by the Commonwealth's failure to exercise due diligence as required by Rule 600, we affirm.

On December 15, 2021, the Commonwealth filed a criminal complaint charging Sutton with aggravated assault[2] and related charges in connection

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] In general, Rule 600 requires the Commonwealth to bring a defendant to trial within 365 days of the filing of the criminal complaint. *See* Pa.R.Crim.P. 600(A)(2)(a).

[2] 18 Pa.C.S. § 2702(a)(1).

with a shooting that struck a victim's leg on December 8, 2021, in Philadelphia. More than two years later, on February 20, 2024, police arrested Sutton on those charges. After a preliminary hearing on March 7, 2024, the charges were bound over for trial.

On May 17, 2024, Sutton filed a motion to dismiss pursuant to Rule 600 based on the delay between the filing of the criminal complaint and his arrest. The trial court held a hearing on the motion on May 21, 2024, at which the Commonwealth presented evidence of its efforts to locate and arrest Sutton. After the parties filed briefs, the trial court issued its findings of fact and conclusions of law and granted Sutton's motion to dismiss on June 28, 2024. The Commonwealth timely appealed and now raises one issue for our review:

> Did the lower court err by dismissing all charges under Rule 600, where the Commonwealth established that it was duly diligent in attempting to apprehend [Sutton] between the filing of the criminal complaint and his arrest, and where fewer than 365 raw calendar days elapsed between [his] arrest and the dismissal of the charges?

Commonwealth's Brief at 4.

"We review a trial court's Rule 600 ruling for an abuse of discretion[.]" *Commonwealth v. Rice*, 331 A.3d 5, 9 (Pa. Super. 2025) (citation omitted). An abuse of discretion "is not merely an error of judgment" but occurs when "the evidence of record establishes that in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will[.]" *Id.* (citation and quotation marks omitted). "[W]e must view the facts in the light

most favorable to the prevailing party and limit our scope of review to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court." *Id.* (citation and quotation marks omitted).

Rule 600 generally requires the Commonwealth to bring a defendant to trial within 365 days of the filing of the criminal complaint. *See* Pa.R.Crim.P. 600(A)(2)(a).

> In a Rule 600 analysis, the "mechanical run date" is 365 days after the complaint was filed. The "adjusted run date" is then calculated by adding any time that is "excluded from the computation" under Rule 600(C)(1). If a defendant is not brought to trial by the adjusted run date, the case is dismissed.

*Rice*, 331 A.3d at 9 (citation omitted). To determine the adjusted run date, Rule 600(C)(1) provides that

> periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of time within which trial must commence. Any other delay shall be excluded from the computation.

Pa.R.Crim.P. 600(C)(1).

If the Commonwealth fails to try the defendant within the prescribed period, the defendant may, at any time before trial, "file a written motion requesting that the charges be dismissed with prejudice on the ground that this rule has been violated." Pa.R.Crim.P. 600(D)(1). "[W]hen a Rule 600 motion is filed before trial commences, Rule 600 is examined as of the date the Rule 600 motion is filed, since logically, a trial date cannot be used as no

- 3 -

trial has commenced." ***Rice***, 331 A.3d at 10 (citation and quotation marks omitted).

"It is the Commonwealth's burden to demonstrate due diligence by a preponderance of the evidence to avail itself of an exclusion under Rule 600." ***Commonwealth v. Graves***, 328 A.3d 1005, 1009 (Pa. Super. 2024) (citing ***Commonwealth v. Selenski***, 994 A.2d 1083, 1089 (Pa. 2010)). "Due diligence is fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort." ***Selenski***, 994 A.2d at 1089.

The record reflects that at the Rule 600 hearing, the Commonwealth presented the testimony of City of Philadelphia Detective Nicholas Martella and Police Officer Timothy McGinn. The trial court also admitted four Commonwealth, and one defense, exhibits, including a police log which documented attempts to locate and apprehend Sutton.

The trial court made the following findings of fact:

> On December 8, 2021, Detective [] Martella was assigned to investigate a nonfatal shooting near the intersection of 23rd and Mifflin Streets in Philadelphia. He determined the identity of the perpetrator based on identifications made by Sergeant Jayson Troccoli, who recognized Sutton from his days on patrol in the first district, and Aquanetta Joyce ("Joyce"), a lifelong friend of Sutton. Following a search of the CLEAR [FN]2 and Bureau of Motor Vehicles databases, and corroborated by Joyce, Detective Martella determined Sutton's address … in Philadelphia and obtained a search warrant for the property. On December 14, 2021, he executed the search warrant, but Sutton was not present. Sutton's sister, whose name was indicated on the property search,

- 4 -

was there and spoke with detectives, telling them that Sutton was not home. Detective Martella spoke with her about the case, left a copy of the search warrant, and recovered several of Sutton's belongings from the basement of the home, where he appeared to be living, including his driver's license and clothing from the shooting. The next day, on December 15, 2021, Detective Martella drafted a criminal complaint and obtained an arrest warrant for Sutton. N.T., 5/21/[20]24[,] at 11-15.

[FN]2 CLEAR Investigation Software is a research tool used by law enforcement that leverages public records to locate individuals, identify phone, address, and vehicle records, and perform advanced web searches.

Detective Martella drove through the neighborhood looking for Sutton, created and sent out a patrol alert with Sutton's picture, which was emailed citywide to law enforcement agencies on December 17, 2021, and reconnected with Joyce to determine if she knew his whereabouts. About a week after executing the search warrant, according to police protocols, Detective Martella turned the case over to the South Detectives Division Warrant Unit ["Warrant Unit"]. [FN]3 From December 2021 to February 2022, Detective Martella simply drove down Sutton's street an estimated five to ten additional times "[h]oping to see [Sutton] in the neighborhood," but made no further attempts to visit the house or apprehend Sutton. [FN]4 [*Id.*] at 16-25.

[FN]3 The [] Warrant Unit is tasked with executing felony arrest warrants from the South Division (excluding homicides and sex crimes).

[FN]4 Th[e trial c]ourt is not certain of the dates or time of day of these efforts as they were not recorded in the Attempt to Apprehend Log.

Officer Timothy McGinn, a member of the South Detectives [W]arrant [U]nit, conducted four surveillances of Sutton's house in December of 2021 by sitting on the block looking for activity coming in and out of the house, including December 17, 20, 22, and 30. In three of the four attempts, the officers were by Sutton's home for no more than ninety-six minutes. [FN]5 [*Id.*] at 41-43, 46-51.

[FN]5 Th[e trial c]ourt deduced the maximum amount of time possible using the Attempt to Apprehend Log, which indicated the time of arrival and the time that the officers were present at the next address on their list; travel time to the next location was not included.

In the twelve months of 2022, the Warrant Unit made only one attempt to apprehend Sutton at his home, on February 23. The only other effort made throughout all of 2022 to locate Sutton was on August 30, when Detective Martella completed a custody check and contacted Joyce regarding possible sightings of Sutton. [*Id.*] at 33, 58.

In the twelve months of 2023, the Warrant Unit made only two attempts to apprehend Sutton:  May 10 and September 28. No evidence was presented as to how the Warrant Unit attempted to apprehend him or if they even visited the home on either of those two dates, just that two attempts were made.  Every attempt to arrest Sutton at his known address from 2021 through 2023 was made by police in the morning house between 6:45 a.m. and 11:31 a.m. and all on weekdays.  [*Id.*] at 24, 44, 49-51, 54, 58.

Finally, in 2024, the Warrant Unit made two additional attempts to apprehend Sutton on February 13 and February 22, the latter of which resulted in his arrest.  No evidence was presented as to what efforts were made on these two dates or if Sutton was arrested as a direct result of efforts by the Warrant Unit.  Sutton was arrested … less than a half mile away from his home.  [*Id.*] at 57-58.

Findings of Fact and Conclusions of Law, 6/28/2024, at 1-3 (party designation altered).

The trial court correctly determined that the mechanical run date for Rule 600 purposes was December 15, 2022, which is 365 days after the criminal complaint was filed.  *See* Findings of Fact and Conclusions of Law, 6/28/2024, at 3; *see also* Pa.R.Crim.P. 600(A)(2)(a); *Rice*, 331 A.3d at 9. The parties agreed with the trial court's ruling that the fifteen days between

May 6, 2024 (pre-trial status hearing) and May 21, 2024 (Rule 600 hearing) were excludable. *See* Findings of Fact and Conclusions of Law, 6/28/2024, at 4; N.T., 5/21/2024, at 8-10. Because the trial court concluded the Commonwealth did not exercise due diligence in bringing Sutton to trial, it determined the adjusted run date was December 30, 2022. *See* Findings of Fact and Conclusions of Law, 6/28/2024, at 4; *see also* Pa.R.Crim.P. 600(C)(1); *Rice*, 331 A.3d at 9. Accordingly, the trial court granted Sutton's Rule 600 motion.

In granting the motion to dismiss pursuant to Rule 600, the trial court explained the Commonwealth's failure to exercise due diligence as follows:

> Police confirmed [Sutton's] residence on December 14, 2021, after they executed a search warrant [at a residence where his sister answered] and found his driver's license, bed, and clothing, yet after their attempts in December [] 2021, the police made merely three attempts in two years to visit or surveil the address. Sutton never left Philadelphia or changed his residence and was ultimately arrested … less than half a mile from that residence. While the police made four visits to Sutton's house during December [] 2021, throughout 2022 and 2023, a two-year span, the police only made four total attempts to locate and apprehend Sutton, including only three visits to his known residence, all in the morning.

Findings of Fact and Conclusions of Law, 6/28/2024, at 4-5 (party designation altered) (citations omitted). In reaching its conclusion, the trial court relied on case law that examined due diligence and pre-arrest delay under Rule 600. *Id.* (citing *Commonwealth v. Ingram*, 591 A.2d 734 (Pa. Super. 1991); *Commonwealth v. Newman*, 555 A.2d 151 (Pa. Super. 1989); *Commonwealth v. Branch*, 486 A.2d 460 (Pa. Super. 1984);

- 7 -

*Commonwealth v. Dorsey*, 440 A.2d 619, 622 (Pa. Super. 1982);

*Commonwealth v. Webb*, 420 A.2d 703 (Pa. Super. 1980);

*Commonwealth v. Collins*, 404 A.2d 1320, 1323 (Pa. Super. 1979)).

The Commonwealth argues the trial court abused its discretion because it exercised due diligence in attempting to locate and apprehend Sutton. Commonwealth's Brief at 12. It blames understaffing and overburdened officers during this period, declaring that "the officers had neither the time nor the resources to continue these efforts ad infinitum without neglecting their responsibilities in their hundreds of other investigations." *Id.*; *see also id.* at 11, 16. According to the Commonwealth, the three officers searching for Sutton were assigned approximately 200 violent felony investigations, with the two Warrant Unit officers sharing 150 of the assignments. *Id.* at 12, 15. Despite its claimed staffing problem, the Commonwealth argues that its more than twelve attempts to apprehend Sutton outside his home (including nine attempts by the Warrant Unit) and contacting witnesses for leads were sufficient to prove its due diligence. *Id.* It also contends that the trial court erred by focusing "'in hindsight' about what else could have been done in a perfect world with unlimited resources." *Id.* at 16-17 (citing *Ingram*, 591 A.2d at 737). According to the Commonwealth, the pre-arrest delay was excludable "due to circumstances beyond [its] control" and therefore, no Rule 600 violation occurred. *Id.* Based upon our review of the record and the relevant precedent, we disagree.

In **Dorsey**, this Court found the Commonwealth exercised due diligence where police visited the defendant's home five times over the span of nearly six months, entered her name into the state crime information center database, and distributed her photograph.[3] **Dorsey**, 440 A.2d at 622. Acknowledging that the police were "perhaps" slow, it found they nevertheless "persisted in their efforts to find" the defendant by "repeatedly checking at the place where she was likely to be," i.e., her residence, and found their efforts were roughly "equivalent to efforts that we have found in other cases constituted due diligence." **Id.** at 622-23 (citations omitted).

In **Ingram**, this Court determined the Commonwealth exercised due diligence during the nearly six-and-a-half months between the filing of the criminal complaint and the defendant's arrest where police entered his name into the state crime information center database and continued to look for him on a "daily basis" during their routine patrols, including places he was known to frequent. **Ingram**, 591 A.2d at 737-38.

In **Commonwealth v. Mitchell**, our Supreme Court found the Commonwealth exercised due diligence during a nearly four-month period between the filing of the criminal complaint and the defendant's arrest. There, a detective visited the home of the defendant's mother (where he had been

---

[3] Prompt trial cases decided before the renumbering of the Pennsylvania Rules of Criminal Procedure were decided under the precursor to Rule 600, Rule 1100; it was renumbered on April 1, 2001. **See Commonwealth v. Barbour**, 189 A.3d 944, 946 n.1 (Pa. 2018).

living) six to eight times, talked with his mother each time, learned generally where the defendant's wife lived and attempted to locate him there, talked to his parole officer, and distributed his photograph to local police. ***Commonwealth v. Mitchell***, 372 A.2d 826, 831-32 (Pa. Super. 1977).

In ***Branch***, this Court determined that the Commonwealth exercised due diligence when a detective made thirty attempts to locate and arrest the defendant during a twenty-seven-month period, conducted bimonthly surveillances of his neighborhood for ten months, contacted his employer, entered his name into a national crime information database, and performed record checks with the bureau of motor vehicles, voter registration, and his police department's criminal records division. ***Branch***, 486 A.2d at 462. After that detective transferred to another division, however, there were no police efforts to locate the defendant until ten months later when he was arrested. ***Id.*** at 462-63.

The ***Branch*** Court explained that in determining whether police acted with due diligence, the court must balance, on one hand, "a common sense approach to law enforcement which recognizes that the police department, not the court, is the best judge of how to deploy limited police personnel" with, on the other hand, "the interest of the accused in receiving a prompt trial[, which] is a precious interest [that] is the court's responsibility to protect." ***Id.*** at 462 (citations omitted). It expounded that due diligence must be judged by what was done, rather than focusing on what was not done. ***Id.*** at 462-

- 10 -

63. Although police efforts to locate the defendant stopped after the detective's transfer, this Court focused on what the police had done and considered hearing testimony regarding police resources to conclude that the original detective's significant efforts to search for the defendant for more than two years constituted due diligence. *Id.*

In contrast, in *Webb*, this Court determined that the Commonwealth failed to exercise due diligence in locating the defendant during a ten day period where drug agents visited his residence and a woman who answered said he was not home, and they visited a shopping mall he was known to frequent on two or three occasions looking for him. *Webb*, 420 A.2d at 706. In concluding police did not exercise due diligence, this Court explained that the police "made only two visits to [his] residence during a ten day period" even though they "had no reason to believe" he was not living there. *Id.* These visits, together with visits to the mall, did not constitute "reasonable efforts to apprehend" the defendant. *Id.*

Further, in *Collins*, this Court determined that the Commonwealth failed to exercise due diligence during a seventy-seven day period where police made a "single unsuccessful visit to the homes of two relatives, followed a month and a half later by [an officer leaving his] card at the [defendant's] mother's residence with a request to be contacted should the [defendant] come calling...." *Collins*, 404 A.2d at 1323.

In the case at bar, the record supports the trial court's findings. Specifically, the record reflects that during the 797 days between the filing of the criminal complaint and Sutton's arrest, the Commonwealth made very little effort to locate Sutton. Most notably, the Warrant Unit made only one visit to Sutton's residence in all of 2022, and two visits there in all of 2023. *See* N.T., 5/21/2024, Ex. C-2. Detective Martella made an additional attempt to locate Sutton in 2022 when he conducted a custody check for Sutton and contacted Joyce to ask if she knew his whereabouts. *See id.* at 33, Ex. C-2. From February 23, 2022 until May 10, 2023, the Warrant Unit went fourteen-and-a-half months without any efforts whatsoever to locate Sutton. *See id.*, Ex. C-2. Police had no reason to believe Sutton did not live at the address they had for him—Detective Martella obtained it through record searches and Joyce, and confirmed that he was living there during the execution of the search warrant, as he located Sutton's belongings in the basement, including his driver's license and clothing from the shooting. *See id.* at 14-15, 26-27; *see also Webb*, 420 A.2d at 706. Looking at 2022 and 2023, four attempts in twenty-four months to locate and arrest Sutton do not constitute "reasonable efforts to apprehend."[4] *See Webb*, 420 A.2d at 706; *see also*

---

[4] Our focus is on police efforts after December 2021, as Sutton concedes, and the trial court agreed, that the Commonwealth exercised due diligence in December 2021. *See* N.T., 5/21/2024, at 57, 62. Those efforts included Detective Martella's driving multiple times down Sutton's street and through his neighborhood, which was located about 100 yards from the police district
*(Footnote Continued Next Page)*

*Collins*, 404 A.2d at 1323. The apprehension efforts here stand in sharp contrast to what our case law has deemed to be duly diligent and are significantly less than the "daily basis" check for more than six months in *Ingram*; bimonthly visits in *Mitchell*; "slow but persistent" monthly visits in *Dorsey*; and thirty attempts in twenty-seven months and ten-month bimonthly surveillance in *Branch*. Under no reading of our case law is three surveillances and one custody check over the course of two years considered to be duly diligent.

Moreover, the Commonwealth does not cite to any record evidence, and our independent review likewise reveals none, to support its claim of limited police personnel and resources as the reason for the lack of police efforts in locating Sutton, nor did the trial court make any such factual findings.[5] The record shows that the two Warrant Unit officers had approximately 150

_____

investigating Sutton, surveilling Sutton's residence, sending a city-wide patrol alert to local officers and law enforcement agencies with Sutton's photograph, and sending text messages to Joyce; and the Warrant Unit's four surveillances of Sutton's residence. *See* Findings of Fact and Conclusions of Law, 6/28/2024, at 2; *see also* N.T., 5/21/2024, at 16-17, 20-23, 28-29, 37, 43-46, 48, Exs. C-2, C-3. However, we note that the trial court's adjusted run date of December 30, 2022 is incorrect, as it should have excluded the sixteen days in December 2021. Nonetheless, based upon our resolution of the Commonwealth's claim on appeal, this minor oversight by the trial court does not impact our review or the outcome of the case.

[5] We further note that we are unable to locate any record support for the Commonwealth's contention at oral argument that the SARS-CoV-2 Omicron variant in any way caused the lack of police efforts to locate Sutton during this time.

assigned warrants to execute between them.[6] N.T., 5/21/2024, at 11, 41. As Sutton points out in his brief, 150 warrants over the course of 2 years assumes a workload of just over 6 warrants per month; when the Warrant Unit had 2 officers, that would be about 3 warrants each per month, and even less when the unit had a third officer.[7] ***See id.*** at 41; ***see also*** Sutton's Brief at 27. We are certainly not unsympathetic to police staffing shortages, and agree with Sutton's statement that "there is no doubt that police officers, generally, are hardworking public servants who should get as much assistance and support as they need to enable them to proficiently do their often dangerous jobs." ***See*** Sutton's Brief at 28. However, neither these numbers nor the record establish limited resources as the cause of the Commonwealth's failure to make more of an effort to locate and arrest Sutton.

Furthermore, we are unpersuaded by the Commonwealth's contention that Detective Martella's "constant contact with an eyewitness[, Joyce], who was also trying fruitlessly to discern [Sutton's] whereabouts from other neighbors because she was afraid for her safety" demonstrated due diligence.

_____

[6] Officer McGinn testified that there were two officers assigned to the Warrant Unit in December 2021, and two or three officers were assigned between December 2021 and January 2024, when the unit disbanded. ***See*** N.T., 5/21/2024, at 41.

[7] We further note that the Commonwealth stated at oral argument that its officers were searching for six to nine individuals to arrest each day, but there is no record evidence of these numbers nor any testimony to demonstrate that such numbers caused the delay in apprehending Sutton.

*See* Commonwealth's Brief at 15. We recognize that "[i]t is not the function of our courts to second-guess the methods used by police to locate accused persons" and that "[d]eference must afforded the police officer's judgment as to which avenues of approach will be fruitful." *See Mitchell*, 372 A2d at 832. However, a review of the hearing transcript reveals that Joyce's concern in communicating with the detective appeared to be securing his help in relocating her for her safety. *See* N.T., 5/21/2024, at 22, 30-31. Further, at the hearing, the trial court found that Detective Martella's communications with Joyce were limited to the "first few months" of the investigation, which was consistent with the detective's testimony. *Id.* at 63.

In reading the facts in the light most favorable to Sutton as the prevailing party below, and consistent with our standard of review, we find no abuse of discretion in the trial court's conclusion that the Commonwealth failed to meet its burden of proving it exercised due diligence in locating and arresting Sutton. *See Rice*, 331 A.3d at 9; *Graves*, 328 A.3d at 1009. Therefore, based on our conclusion that the Commonwealth did not exercise due diligence in 2022 and 2023, that period is included in the computation of time within which trial must commence, rendering the delay well beyond the requisite 365 days, in violation of Rule 600. *See* Pa.R.Crim.P. 600(A)(2)(b); *Rice*, 331 A.3d at 9. Accordingly, we affirm the trial court's order granting the Rule 600 motion and dismissing the case.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>6/20/2025</u>