409 A.2d 54

**COMMONWEALTH of Pennsylvania**

**v.**

**Dennis HINTON, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 12, 1977.

Filed Aug. 24, 1979.

Petition for Allowance of Appeal Denied Dec. 10, 1979.

2. Theft offenses will never rise above a felony of the third degree, 18 Pa.C.S.A. § 3903.

John W. Packel, Assistant Public Defender, Chief, Appeals Division, Philadelphia, for appellant.

Eric B. Henson, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

PRICE, Judge:

Following a jury trial, appellant was convicted on October 6, 1976, of rape [1] and possession of an instrument of crime generally.[2] Appellant's post-trial motions were denied, and he was sentenced to imprisonment of from three to ten years on the rape conviction and one to two years on the possession charge. For the reasons set forth herein, we affirm the judgment of sentence.[3]

Appellant first maintains that the judgment must be vacated because the Commonwealth failed to comply with Pa.R.Crim.P. 1100(a)(2),[4] which requires that a defendant be brought to trial within 180 days of the complaint's filing. The alleged rape in this case occurred at approximately 12:30 a. m., on July 17, 1975. When police displayed photographs to the complainant that day, she selected appellant's picture and stated that she was "90% sure" that he was her assailant. On August 24, 1975, the complainant contacted the police to inquire of the case's progress. The following day, she was shown a second group of photographs, out of which she selected appellant's photo and was "100% sure." On September 14, 1975, a complaint was lodged against appellant, and a warrant issued for his arrest. Police immediately contacted prisons, including Holmesburg Prison, Philadelphia County, to determine whether appellant was incarcerated. When police received no information to indicate that appellant was incarcerated, they commenced a street investigation on September 22, 1975.

When an officer went to appellant's home, no one responded. Housing police at appellant's apartment building were informed of the warrant, given a photograph of appellant,

1.  18 Pa.C.S. § 3121.

2.  18 Pa.C.S. § 907(a).

3.  We note with disapproval that the Commonwealth has apparently not seen fit to submit an appellate brief to this court.

4.  Pa.R.Crim.P. 1100(a)(2) mandates that: "Trial is a court case in which a written complaint is filed against the defendant after June 30, 1974 shall commence no later than one hundred eighty (180) days from the date on which the complaint is filed."

and asked to contact the police department if they saw him. When an officer returned to appellant's residence on November 1, 1975, appellant's mother informed him that she did not know her son's whereabouts; she had thrown him out of the home. Two subsequent trips to appellant's residence, and conversations with Mrs. Hinton in December 1975 and in March 1976, resulted again in frustration. On March 5, 1976, police learned that since September 22, 1975, appellant had been incarcerated. He was arrested that day.

■ Because the complaint in this case was filed on September 14, 1975, appellant's trial had to commence on or before March 15, 1976,[5] absent any Commonwealth-requested extensions under Pa.R.Crim.P. 1100(c), or any automatic exclusions of time under Pa.R.Crim.P. 1100(d) due to the defendant's unavailability. Appellant's first trial, which resulted in a mistrial when the jury was unable to reach a unanimous result, actually commenced on July 7, 1976, 294 days after the complaint's filing. Because there were no extensions of time granted under Rule 1100(c), we must find at least 114 days of excludable time under Rule 1100(d) in order for the Commonwealth to prevail. We find that appellant was unavailable for Rule 1100 purposes prior to March 6, 1976, and that this unavailability resulted in 173 days of excludable time. Accordingly, we hold that he was timely tried.

Before embarking upon a consideration of legal precedent for our holding, we note that we are affirming on the Rule 1100 issue for a reason vastly different from the one relied upon by the Honorable Lisa Richette of the Court of Common Pleas of Philadelphia County. In the hearing on appellant's motion to dismiss under Rule 1100(f), considered by Judge Richette on June 16, 1976, the Commonwealth contended that the actual filing date of the complaint in this case was not September 14, 1975, but was March 6, 1976.

---

**5.** The one hundred eighty day period actually expired on March 13, 1976, which was a Saturday. It was therefore required that trial commence on or before the following Monday, March 15, 1976. *See* 1 Pa.C.S. § 1908.

The Commonwealth's reasoning was that although Detective Kephart, the complainant, and Judge Ralph Dennis, the affiant, signed the complaint on September 14, 1975, Judge Conroy did not finally acknowledge the complaint until March 6, 1976. Over the protestations of trial counsel that because the warrant of arrest was issued pursuant to that complaint on September 14, 1975, it was obvious that legal processes had commenced then, Judge Richette favored the Commonwealth; she held that the complaint in this case was filed on March 6, 1976, when Judge Conroy signed it and it was placed in the Quarter Sessions file.

■ Apparently, the procedure utilized in Philadelphia in this case was the same as that condemned in *Commonwealth v. Lewis,* 254 Pa.Super. 152, 385 A.2d 570 (1978). In *Lewis,* the Court of Common Pleas of Philadelphia County had explained the local procedure:

"In Philadelphia, the procedure is that after a complaint is signed, it remains in the hands of the police until the defendant is arrested and arraigned. It is at that point that the various copies of the complaint are distributed to the Court, the District Attorney and to the defendant. It is this Court's analysis of Rule 1100 that the Supreme Court in promulgating that rule intended and meant by the words, 'When the complaint is filed,' to mean when the complaint is filed at the preliminary arraignment when the four copies of the complaint be dispersed and the defendant arraigned."

On appeal, we condemned such an obvious effort to circumvent Rule 1100, noting that there was apparently no limit under the procedure as to how long the police could continue to hold the complaint and thereby attempt to toll the Rule. Again, we note the extreme disfavor with which we view this procedure. If the time differential between the endorsements were just several days, it could no doubt be explained as administrative delay. The time lapse in this case indicates, however, that this procedure was simply devised in an effort to undercut the Rule's purpose. It is well settled that a judgment may be affirmed by the appel-

late court on any legal theory, regardless of the rationale or theory employed by the lower court. *Commonwealth v. O'Donnell,* 472 Pa. 25, 370 A.2d 1209 (1977); *Commonwealth v. Cunningham,* 471 Pa. 577, 370 A.2d 1172 (1977); *Commonwealth v. Whitehouse,* 222 Pa.Super. 127, 292 A.2d 469 (1972). Accordingly, although we are in complete disagreement with the rationale of the court below, we agree with the result reached, and will affirm the judgment of sentence.

The pertinent question in this case is whether the Commonwealth proved by a preponderance of the evidence that it acted with due diligence in locating and apprehending appellant. *Commonwealth v. Mitchell,* 472 Pa. 553, 372 A.2d 826 (1977).

In *Commonwealth v. Mitchell, supra,* the Commonwealth asserted the appellant's unavailability as cause for the commencement of trial after the expiration of the 180 day period. To refute the Commonwealth's assertion that it could not locate Mitchell, it was argued that he received public assistance benefits and that he was employed under his own name. Mitchell argued that the Commonwealth could have located him through one of these associations. The record did not reflect, however, that the police department knew either that assistance was being received or that Mitchell was employed. The court declared:

> "It is not the function of our courts to second-guess the methods used by police to locate accused persons. The analysis to be employed is whether, considering the information available to the police, they have acted with diligence in attempting to locate the accused. *Deference must be afforded the police officer's judgment as to which avenues of approach will be fruitful."* *Id.,* 472 Pa. at 566, 372 A.2d at 832 (emphasis added).

In *Mitchell,* the police visited a known address on several occasions and circulated in the police department a photograph of the appellant. The supreme court found that those steps adequately demonstrated due diligence.

In *Commonwealth v. Jones*, 256 Pa.Super. 366, 389 A.2d 1167 (1978), this court considered the identical question. In a fact situation closely following the one presently before us, including an intervening arrest, arraignment and court appearance, we held that although the police could have pursued other avenues to locate appellant, that is not the controlling factor. It is simply not required that the Commonwealth exhaust every conceivable method of locating a defendant. Rather, when reasonable steps are taken, the requirement of due diligence is met.

It seems clear that the test is *not* a venture into hindsight reasoning as to whether, if certain individuals had been contacted, or other things done, an arrest would probably have been made. The matter of availability and due diligence must be judged by what *was* done by the authorities rather than what was not done. The standard of due diligence demands only reasonable efforts.

In applying that standard to the facts as recounted, we have no difficulty in concluding that the Commonwealth established due diligence. Accordingly, there were 173 days of excludable time. Appellant's first trial, commencing on July 7, 1976, therefore began on the 121st day of the mandatory period, and the Rule was satisfied.[6]

Appellant next maintains that the trial court erred in restricting cross-examination relating to a witness's reasons for altering his testimony from exonerating to implicating appellant. On Friday, October 8, 1976, the prosecution called Arnold Jones to the witness stand. The following then transpired:

"BY MR. ROSENBERG [Assistant District Attorney]:

6. Although appellant does not question the Commonwealth's compliance with Rule 1100 as to the second trial's commencement, we note that it commenced on October 7, 1976, or ninety days after declaration of the mistrial, on July 9, 1976. This was well within the 120 days allowable for commencement of a second trial following a mistrial. *See, Commonwealth v. Legree*, 256 Pa.Super. 128, 389 A.2d 634 (1978).

Q. In July of 1975, were you on the 1900 block of Catharine Street around two o'clock in the morning? In the month of July, were you there?

A. Yeah.

Q. And at that time did you see Robin Smithers there?

A. Yeah, I seen her.

Q. Did you see Dennis Hinton there?

A. No.

Q. The person you have just identified today as the defendant, Dennis Hinton, did you see him there with Robin Smithers in July of 1975?

A. No." (N.T. 142–43).

The witness had previously indicated that he happened to walk by the building in which the rape occurred on July 17, 1975. He saw appellant, whom he knew previously, kissing the victim, and after he greeted appellant and appellant went on his way, he conversed with the victim. He then identified appellant to her as "David," and she told the witness that he had raped her. Because the witness's statement at appellant's second trial was completely contrary to his earlier statements, the Commonwealth requested a sidebar conference, and the jury was taken from the courtroom. Surprised by the witness's testimony, the Commonwealth desired to cross-examine its own witness; the prosecution had a prior inconsistent statement made by the witness to police and his prior inconsistent testimony at appellant's first trial. The witness indicated a desire not to testify further at the second trial, but was informed that he would be held in contempt. During an in-chambers discussion prior to recommencing trial on October 12, 1976, the witness stated that he would testify and would tell the truth. On taking the stand, the witness acknowledged that he saw Robin Smithers on the 1900 block of Catharine Street in July 1975, and that she was with Dennis, whom he purposely misidentified to her.

"Q. [By Assistant District Attorney] When you say Dennis, who are you talking about?

A. Dennis Hinton.

Q.  Is he in the Courtroom today?

A.  Yeah.

Q.  Where is he?

A.  Over there.

Mr. Rosenberg:  Indicating the defendant.

Q.  Now, Mr. Jones, on Friday you testified that you did not see Dennis Hinton there.  Do you remember that?

A.  Yeah.

Q.  Why did you testify that way?"  (N.T. 181).

The court then proposed at side-bar that the questioning could proceed in one of two ways.  The witness could be required to respond to the question before the jury, and curative instructions would be given if necessary, or the answer could be taken outside the jury's presence so that risks of any undue prejudice could be checked.  Although defense counsel objected to both plans, the court proceeded to excuse the jury, thereby exercising the utmost of caution.

Out of the jury's hearing, the witness admitted that his testimony the preceding Friday—that he did not see appellant—was given to avoid trouble, and because he "was afraid."  The court then questioned the witness:

"Were you afraid to tell us that somebody else did it or were you afraid to tell us that he did it, that the defendant was there?

THE WITNESS:  Yeah.

THE COURT:  Which one?

THE WITNESS:  That he was there.

THE COURT:  You were afraid to tell us that he was there?

THE WITNESS:  Yeah.

THE COURT:  It wasn't because you were afraid to tell that someone else was there?

THE WITNESS:  No."  (N.T. 193).

In his appellate brief, appellant contends that:

"On cross-examination appellant's trial counsel attempted to elicit testimony from Arnold Jones concerning the source of the fear that caused him to change his testimo-

ny, specifically, whether the change was the result of pressure from the police and/or district attorney's office. The jury certainly should have heard, and appellant was entitled to elicit, any evidence which had a direct bearing on which version of the facts, presented by this witness, was more believable." (Appellant's Brief at 18–19) (footnote omitted).

On cross-examination, defense counsel attempted to question Jones on police duress that allegedly led to Jones' first formal statement implicating appellant. The court below ruled that the statement was not introduced into evidence, and cross-examination on duress was therefore curtailed. Appellant argues that "the issue was not coercion on the statement per se, but rather on the *witness* as a person," and that since reference was made to the statement to impeach the witness, it was properly in evidence anyway.

As has been recognized repeatedly, "[t]he scope of cross-examination is largely within the sound discretion of the trial judge, and even if a ruling is erroneous, the error is not grounds for reversal unless it results in apparent injury." *Commonwealth v. Donnelly*, 233 Pa.Super. 396, 417, 336 A.2d 632, 644 (1975) (citations omitted). The court took every precaution in this case to preclude the jury's concluding that the witness was being strong-armed by appellant to alter his testimony from implicating to exonerating him. Because the first statement given by the witness to the police was not on the record, questions designed to identify coercion as its basis were properly ruled irrelevant. The more crucial question in this case was obviously the reason for Jones' in-court statement that he had not seen appellant at the scene, which was his only testimony to that effect. Prior to that appearance and afterward, Jones adhered to his position that he had seen appellant with the victim on the night in question, and that he purposely misidentified him as "David." When the court was informed that the witness was not afraid to tell that someone else was in fact involved, but was afraid to testify that appellant was involved, which information was revealed outside the jury's

hearing, it became obvious to the court that pressing the witness to identify the source of the coercion could only harm appellant. Accordingly, such was not a permissible area of inquiry.

Appellant seems to be suggesting that the Commonwealth exerted efforts to affect the witness's original statement implicating appellant; how that, if true, supposedly affected the witness's ultimate implication of appellant at trial is difficult to comprehend. Appellate counsel argues that cross-examination "to elicit testimony from Arnold Jones concerning the source of the fear that caused him to change his testimony, specifically, whether the change was the result of pressure from the police and/or district attorney's office," was improperly curtailed. It was counsel's apparent hope to establish the untruth of all of the witness's statements implicating appellant. The court treaded cautiously in this area, as it had a right to do, already having been informed by the witness that it was the pressure not to testify against appellant which convinced him to deny appellant's appearance at the scene. It was therefore out of an abundance of caution that the court did not wish to permit inquiry into the source of the pressure on the witness. This was not done in an effort to keep relevant information from the jury, but rather to preclude further prejudice to appellant.

Appellant contends that cross-examination of Dr. Gloria Bachman, who examined the complainant after the alleged rape, was also improperly narrowed in scope.

Dr. Bachman testified that the victim's vulva showed fresh superficial lacerations. She further stated:

"A. Breaks in the skin are what lacerations mean, and there were some areas of this type of leision on the outside part of her private area.

Q. Doctor, did that indicate anything to you?

A. It indicates trauma to the area, a break in the skin continuity."

(N.T. 256).

The court asked Dr. Bachman:

"[I]s your finding of trauma in the area in which you said you saw trauma consistent with the allegation given in the history in the case that she gave to you, consistent or inconsistent?

THE WITNESS: I think my findings on physical exam are consistent with forced type of intercourse, forced type of sex act.

.   .   .   .   .

Q. [By defense counsel] Doctor, are those findings equally consistent with consentual [sic] intercourse?

A. I would not expect to find any type of trauma on consentual [sic] intercourse unless it was consent to some type of sadomasochism or very traumatic type of intercourse   .   .   ..

.   .   .   .   .

From my expert medical opinion, I would say that intercourse as designed by the introduction, the penetration of the penis into the vagina as such, the penis being a blunt instrument, one would not expect to see lacerations or breaks in the vulva skin regardless of the size of the penis." (N.T. 260–62).

Defense counsel later questioned:

"Laceration, you said you would not expect it to be caused by a blunt instrument such as a penis without the use of force. Is that correct?

A. Correct." (N.T. 265).

Questions posed by counsel regarding this area of examination were redundant, and some were of a very speculative nature. From our reading of the record, it does not appear that counsel's right to cross-examine Dr. Bachman on the implication of the lacerations of the vulva was foreclosed, as alleged.

Later in his cross-examination, counsel queried:

"Q. And were there any lacerations of the hymen?

.   .   .   .   .

A. Pelvic exam, the hymen was without fresh tears or lacerations.

Q. Without fresh tears or lacerations. I assume that means there were tears or lacerations?" (N.T. 268–69). The Commonwealth's objection was sustained. The court instructed counsel that he could not assume things before the jury, saying "If you have a question, you may ask the question and I'll rule." (N.T. 269). Counsel changed his approach, saying, "Physical examination, what did you write down for hymen?" The court sustained an objection, maintaining that unless particular notations were relevant to the issue, the court was not concerned with the full content of the report. At that juncture, appellant's counsel stated that he had no further questions.

It is counsel's responsibility, not that of the trial court, to correctly formulate proper questions to elicit testimony. Here, counsel's first question, dealing with an "assumption," was improper form; the second question was too broad in scope. Had counsel correctly formulated his questions, he could have elicited the testimony he desired. Failure to have done so precludes relief.

Appellant's final contention deals with his conviction of possession of an instrument of crime. Section 907 of the Crimes Code reads, in part, as follows:

"§ 907. Possessing instruments of crime.

(a) Criminal instruments generally.—A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally.

(b) Possession of weapon.—A person commits a misdemeanor of the first degree if he possesses a firearm or other weapon concealed upon his person with intent to employ it criminally.

(c) Definitions.—As used in this section the following words and phrases shall have the meanings given to them in this subsection:

'Instrument of crime.'

(1) Anything specially made or specially adopted for criminal use; or

"(2) anything commonly used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have."

■ Due to his possession of a handgun at the time of the alleged rape, appellant was indicted and convicted under 18 Pa.C.S. § 907(a). Appellant's basic contention is that a handgun is not an "instrument of crime" reachable by § 907(a), but rather a firearm punishable under § 907(b). Appellant argues that the two sections are mutually exclusive; that if anything, his conduct was cognizable under § 907(b), and that he should accordingly be discharged as to his conviction under § 907(a). This argument was specifically presented in *Commonwealth v. Smith*, 253 Pa.Super. 279, 384 A.2d 1343 (1978), and there we rejected it. In accordance with that decision, we affirm appellant's conviction for possession of an instrument of crime.

For the foregoing reasons, we affirm the judgment of sentence imposed in the court below.

SPAETH, J., files a dissenting opinion.

HOFFMAN, J., files a dissenting statement.

JACOBS, J., did not participate in the consideration or decision of this case.

SPAETH, Judge, dissenting:

Rather than affirming the judgment of sentence, as does the majority, I should remand for further proceedings.

The majority agrees, and in any event it is settled, that the Commonwealth had the burden of proving that it exercised due diligence in trying to find appellant. *Commonwealth v. Mitchell*, 472 Pa. 553, 372 A.2d 826 (1977); *Commonwealth v. Kovacs*, 250 Pa.Super. 66, 378 A.2d 455 (1977). The majority states, however, that "due diligence" means "only reasonable efforts." At 58. I find this unhelpful, for two reasons. If "only reasonable efforts" is offered as a *synonym* for "due diligence", it in no way advances our inquiry, for we are given no criteria by which to decide

whether the efforts in question were "only reasonable". If "only reasonable efforts" is offered as an *alternative* to "due diligence", it represents a dilution, or relaxation, of the standard by which the Commonwealth's efforts will be measured. This is in fact how I read the majority opinion, especially given the emphasis on *only* reasonable efforts.

Of course, a court has considerable freedom in how it defines a legal standard,[1] but it ought to use words in their everyday sense; and in that sense, "due diligence" connotes more than "only reasonable efforts". Thus a standard definition of "diligence" is:

> persevering application: devoted and painstaking application to accomplish an undertaking: ASSIDUITY (the proverbial of the bee).

Webster's Third New International Dictionary 633 (1965). A police officer told that he is required to make "only reasonable efforts" to find an accused will not understand that he is required to apply himself in a "devoted and painstaking" manner.

Accepting, then, that "due diligence" and not "reasonable efforts" is the appropriate standard to be applied, the question becomes how that standard should be applied. When a court says that due diligence has, or has not, been exercised, it is stating a conclusion of law. The conclusion is not a "pure" conclusion, by which I mean, a conclusion that may be found in the books, as for example (to pick an example at random) that a particular exculpatory clause is, or is not, valid. *See Employers L. A. C. v. Greenville B. Men's A.*, 423 Pa. 288, 291–92, 224 A.2d 620, 622–23 (1966). Instead, the conclusion is one that must be derived from the court's appraisal of a factual record. First the court must ask: According to the record, what did the police and prosecutor do in order to bring the accused to trial? One answer to this question may be that the record doesn't show what they did; another answer may be that what the record shows will

1. *Cf.* Charles Evan Hughes's statement: "We are under a Constitution, but the Constitution is what the judges say it is." Speech, May 3, 1907, quoted in R. Aldisert, The Judicial Process 501 (1976).

depend upon which witnesses the court believes. In any event, when the court has decided what the police and prosecutor did, then it must ask: Does this conduct, as a matter of law, represent due diligence?

It is apparent that the degree of difficulty the court will experience in answering this question will depend upon the quality, or completeness, of the record. Sometimes the court will experience no difficulty. *See, e. g., Commonwealth v. Kovacs, supra* (no due diligence where district attorney's office by own admission waited eight months before requesting custody of accused). Other times the record will be insufficient to support a conclusion—any conclusion, either that there was due diligence or that there was not—in which event the court will remand the case so that the record may be made more complete. *Cf. Commonwealth v. Garnett,* 258 Pa.Super. 115, 392 A.2d 711 (1978) (no transcript; case remanded for due diligence hearing); *Commonwealth v. Ferebee,* 479 Pa.Super. 1, 393 A.2d 804 (1978) (same); *Commonwealth v. Gardner,* 253 Pa.Super. 233, 384 A.2d 1318 (1978) (remand to determine the voluntariness of the waiver); *Commonwealth v. Laudenslager,* 259 Pa.Super. 118, 393 A.2d 745 (1978) (SPAETH, J., dissenting) (urging that case should be remanded to the lower court for a hearing to determine whether the Commonwealth had exercised due diligence).

The majority has no difficulty in finding that the police exercised due diligence in locating appellant because the police checked the county prison once in September 1975 to determine whether appellant was incarcerated, and conducted a street investigation. The police, however, did not check the prison again until March 1976; if they had they would have learned that appellant had been incarcerated there since September 22. It seems that it would have been a simple matter for the police either to check the prison sooner or to ask the prison to let them know if appellant turned up there. Because of this, I should like the record to show why the police did not take such actions. More specifically, I should like to know what standard police practice required.

Are there police training manuals that instruct an officer on what he should do when looking for someone accused of a crime? What sort of procedures are in effect at the prison? Also, how much trouble, in terms of personnel, time, and record keeping, is it to ask a prison to keep on the lookout for someone, and for the prison to do so?

The answers to these questions would be helpful in determining whether the police acted with due diligence. Suppose, for example, that on remand it were shown that the Philadelphia police—whose due diligence is at issue here—regularly leave word with the prison; that their training manuals and courses of instruction regularly prescribe that this be done; and that the prison has no trouble doing it, and often finds persons the police are looking for. I should be surprised if on such a record it could even be said that "only reasonable efforts" had been made, much less that "due diligence" had been exercised. I don't imply that evidence of standard practice would be controlling. Sometimes practice may be standard but nevertheless careless. If the evidence were that the police never checked the prisons, but that it would be no trouble to do so, the conclusion that they had failed to exercise due diligence might be warranted. *Cf. Speyer, Inc. v. Humble Oil and Refining Cc.*, 403 F.2d 766, 770 n. 8 (3d Cir. 1968) (evidence of custom or practice is relevant to a determination of the standard of care to which the defendants are held but it is not conclusive); *George v. Morgan Construction Co.*, 389 F.Supp. 253, 262 (E.D.Pa.1975) (customary method could be negligent despite the fact that it was in general use in the trade).

We are dealing with a grave crime. I am unwilling, however, to hold appellant by diluting the standard of due diligence, which seems to me the effect of the majority opinion; for that would undermine the right to a speedy trial to which everyone accused of crime, not just appellant, is entitled. I submit that the better course is to maintain the standard, while insisting upon a record full enough to enable us to conclude with confidence that it either has, or has not, been met.

I should remand for further proceedings consistent with this opinion.[2]

HOFFMAN, Judge, dissenting:

I agree with Judge Spaeth that the record is insufficient to support a conclusion that the police exercised due diligence in this case. Accordingly, I, too, would remand for production of evidence on the issue of due diligence.

2. Because I should remand for a hearing to determine whether appellant's Rule 1100 rights were violated, I find it unnecessary to reach appellant's other claims.