477 A.2d 491

Karen CULBRETH, Marie Goff, Elbert Walker, Jr., Mildred Walker and Beatrice Tyner on Behalf of Themselves and All Others Similarly Situated

v.

LAWRENCE J. MILLER, INC., Ira L. Straff, Michael S. Straff, Paul Straff and Seth Straff d/b/a Insurance Adjustment Bureau on Behalf of Themselves and All Others Similarly Situated.

Appeal of Karen CULBRETH and Marie Goff on Behalf of Themselves and All Others Similarly Situated.

Superior Court of Pennsylvania.

Argued Oct. 13, 1983.

Filed May 11, 1984.

376

378

David A. Scholl, Bethlehem, for appellants.

Alan Kear, Philadelphia, for appellees.

Before SPAETH, President Judge, and MONTEMURO and POPOVICH, JJ.

SPAETH, President Judge:

This is an appeal from an order dismissing appellants' amended complaint for failure to state a claim upon which relief may be granted. The amended complaint alleges, in Count I, that appellees, as licensed public adjusters, violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.*, and, in Count II, the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* We hold that a claim has been stated for violation of the Consumer Protection Law but not for violation of the Federal Trade Commission Act. We therefore reverse in part and affirm in part.

The action is a class action seeking damages and injunctive relief. Appellants' amended complaint alleges that after suffering property losses due to fire, they entered into insurance adjustment contracts with appellees as licensed public adjusters, but that appellees failed to inform them of their right to cancel the contracts, and failed to honor valid cancellations of the contracts. In Count I of the complaint appellants allege that appellees thereby violated section 7 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–7, and in Count II, the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*, more specifically, the Federal Trade Commission Rule regarding door-to-door sales, 16 C.F.R. § 429. Appellees filed preliminary objections that appellants had failed to state a claim upon which relief could be granted because, they contended,

neither the Consumer Protection Law nor the Federal Trade Commission Rule applies to public adjusters or public adjuster contracts. The trial court sustained the preliminary objections and dismissed the amended complaint. (The court denied other preliminary objections, but that ruling is not at issue.)

–1–

Appellants argue that the trial court erred in holding that appellees, as public adjusters, are not subject to the provisions of section 7 of the Consumer Protection Law, 73 P.S. § 201-7. We agree.[1]

1. When appellants' complaint was filed, the Insurance Department had issued no regulations pertaining to public adjusters. Later, however, the Department did promulgate regulations, 31 Pa.Code § 115.1 *et seq.*, effective August 15, 1980. While these regulations substantially track section 7 of the Consumer Protection Law, they differ in several significant respects. The provisions of section 7 will be discussed in a moment. However, the regulations apply to all public adjuster contracts, not just those made in connection with a call on the buyer at his residence; do not require that the notice of the right to cancel and the notice of cancellation form be written in any language other than English; do not provide for the waiver of a buyer's right to cancel; but do provide that the buyer remains "liable for reasonable and necessary emergency out-of-pocket expenses or services which were paid for or incurred by the public adjuster during the three-day period to protect the interests of the insured," 31 Pa.Code § 115.3(f).

The trial court held that there was an irreconcilable conflict between these regulations and the provisions of section 7 of the Consumer Protection Law. Then, in reliance on the rule of construction that the specific prevails over the general, 1 Pa.C.S. § 1933, the court held that the regulations are controlling and that appellants therefore do not have a cause of action under the Consumer Protection Law. On appeal, the parties have presented extensive arguments on the issue of whether there is a conflict between the regulations and the statute, and if there is, which should prevail.

The trial court's analysis and the parties' arguments in this respect have in large part missed the relevant issue. If public adjusters and public adjuster contracts are excluded from regulation under the Consumer Protection Law, then the provisions of the Consumer Protection Law are inapplicable and the regulations are controlling, but if public adjusters and public adjuster contracts are not so excluded, then the provisions of the Consumer Protection Law are applicable and the Insurance Department cannot override those provisions by promulgating regulations. *See Commonwealth v. Di Meglio,* 385 Pa. 119, 124, 122 A.2d 77, 79 (1956) ("The power of an administrative agency to prescribe rules and regulations under a statute is not the

Section 7 of the Consumer Protection Law, 73 P.S. § 201–7, provides a right of recission in favor of a purchaser of goods or services having a sales price of $25 or more when the sale or contract of sale is made in connection with a call at the buyer's residence. 73 P.S. § 201–7(a). Under section 7, when the buyer signs the contract or makes the purchase, the seller must inform the buyer of the right to cancel the transaction at any time before midnight of the third business day after the transaction, *id.* at § 7(d), and provide the buyer with both a contract or receipt containing notice of the right to cancel and a completed "Notice of Cancellation" form, *id.* at § 7(b), (c). If the language principally used in the oral sales presentation was other than English, both the contract and the cancellation form must be in that language, as well as in English. *Id.* at § 7(b). The three-day cancellation period does not begin to run until the buyer is informed of the right to cancel and is provided with the cancellation form. *Id.* at § 7(e). Within ten business days after receipt of the buyer's Notice of Cancellation, the seller must refund all payments made

power to make law, but only the power to adopt regulations to carry into effect the will of the Legislature as expressed by the statute."); *Wilbert v. Harleysville Mutual Insurance Co.,* 254 Pa.Super. 217, 385 A.2d 987 (1978) (administrative agency may not promulgate regulations contrary to legislative intent expressed in statutory provision to which regulation relates); *Robeson v. Philadelphia Tax Review Board,* 13 Pa.Commw. 513, 319 A.2d 201 (1974) (fundamental proposition of law that rule or regulation of an administrative agency may not be inconsistent with or contrary to provisions of a statute). In either event, the initial inquiry is whether public adjusters and public adjuster contracts are excluded from regulation under the Consumer Protection Law, and this can be determined only by an analysis of the relevant statutes and a determination of the Legislature's intent. If the Legislature did not intend that the Insurance Department should have exclusive authority to regulate public adjusters, and did intend that public adjusters should be subject to the provisions of the Consumer Protection Law, then the Insurance Department does not have the power to promulgate regulations in conflict with the Consumer Protection Law.

Therefore, in the ensuing discussion we shall consider whether public adjusters and public adjuster contracts *are* excluded from regulation under the Consumer Protection Law, and whether the Legislature *did* intend that the Insurance Department should have exclusive authority to regulate them.

under the contract or sale. *Id.* at § 7(g). The buyer may waive the right to cancel, but only if the goods or services are needed to meet "a bona fide immediate personal emergency" of the buyer and the buyer makes a handwritten, signed personal statement describing the situation and expressly waiving the right to cancel. *Id.* at § 7(j).

■ Section 3 of the Consumer Protection Law, 73 P.S. § 201–3, provides in relevant part: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ... are hereby declared unlawful." Section 2(3) of the Consumer Protection Law defines "trade" and "commerce" as "the advertising, offering for sale, sale or distribution of *any services* and any property ...." (emphasis added). This already broad language is to be construed broadly so as to effectuate as fully as possible the Legislature's purpose of preventing unfair or deceptive practices. Thus in *Commonwealth v. Monumental Properties,* 459 Pa. 450, 329 A.2d 812 (1974), the Supreme Court held that the leasing of residences falls within the Consumer Protection Law. The Court rejected the argument that leasing was not included within the Law's definition of "trade" and "commerce" because the definition explicitly refers only to "sale or distribution." The Court recognized the fact that the Legislature did not use the word "lease," but looked to the breadth of the Legislature's purpose of preventing unfair or deceptive practices.

■ The business of a public adjuster is to sell to an insured the service of representing the insured in settling with the insured's carrier the insured's claim for loss. *See* 40 P.S. § 301. Clearly, this business is within the Consumer Protection Law's definition of "trade" and "commerce."

■ The Legislature expressly excluded certain businesses from regulation under the Consumer Protection Law. Thus the Consumer Protection Law provides an express exclusion from its provisions for "any owner, agent or employee of any radio or television station, or ... any

owner, publisher, printer, agent or employee of a newspaper or other publication, periodical or circular, who, in good faith and without knowledge of the falsity or deceptive character thereof, publishes, causes to be published or takes part in the publication of such advertisement." 73 P.S. § 201–3. However, the Consumer Protection Law provides no express exclusion from its provisions for public adjusters or public adjuster contracts. Accordingly, there is no exclusion. *Commonwealth v. Monumental Properties, Inc.*, *supra*, 459 Pa. at 457 n. 5, 329 A.2d at 815 n. 5 ("There is no indication of an intent to exclude a class or classes of transactions from the ambit of the Consumer Protection Law. When the Legislature deemed it necessary to make an exception from the Law's scope, it did so in clear language.").

Appellees nevertheless insist that they are excluded from regulation under the Consumer Protection Law because, they say, under the Unfair Insurance Practices Act, 40 P.S. § 1171.1, *et seq.*, and the Public Adjuster Law, 40 P.S. § 301 *et seq.*,[2] the Legislature gave the Insurance Department the exclusive authority to regulate them and their contracts with insureds. This argument is without merit.

The Unfair Insurance Practices Act provides that no "person" shall engage in any trade practice defined or determined to be an unfair method of competition or an unfair or deceptive act in the "business of insurance." 40 P.S. § 1171.4. The purpose of the Act is to "regulate trade practices in the *business of insurance* in accordance with the intent of congress as expressed in the [McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.*]." 40 P.S. § 1171.2 (emphasis added).

**2.** The Public Adjuster Law was recently repealed and replaced by the Act of December 20, 1983 (No. 72), effective immediately, entitled, "An act providing for the licensing and regulating of public adjusters and public adjuster solicitors." 1983 Pa.Legis.Serv. 519 (Purden). This Act is not here at issue, and we therefore do not now decide whether under it the Legislature has given the Insurance Department the exclusive authority to regulate public adjusters and their contracts with insureds.

In construing the McCarran-Ferguson Act in *Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982), the United States Supreme Court identified three factors relevant to determining whether a particular practice is part of the "business of insurance": *"first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry." After considering these three factors, the Court held that an insurance company's use of a peer review committee to evaluate policyholders' claims for chiropractic treatments was not a part of the "business of insurance." *See also Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) (provider agreements negotiated to carry out policy obligations not part of "business of insurance"); *Securities & Exchange Comm'n v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) (merger of two insurance companies not part of "business of insurance"). With respect to the first factor the Court observed that use of a peer review committee plays no part in spreading or underwriting a policyholder's risk. The Court noted that risk is transferred by means of the insurance policy and that the transfer is complete when the contract is entered into. With respect to the second factor the Court viewed the use of a peer review committee as a separate arrangement between the insurer and third parties, and a matter of indifference to the policyholder. With respect to the third factor the Court observed that use of a peer review committee involves third parties wholly outside the insurance industry. The dissent viewed the peer review committee as essentially the insurance company's claims adjuster. It further viewed claims adjustment as an integral part of the relationship between the insurer and the insured and therefore a part of the "business of insurance." The majority rejected this view, stating that the peer review committee was not the claims adjuster because the commit-

tee's evaluation was nonbinding. The Court therefore viewed the use of the peer review committee as ancillary to the claims adjustment process.

■ A consideration of public adjuster contracts in light of the three factors identified in *Pireno* leads to the conclusion that public adjuster contracts are not a part of the "business of insurance." Just as in *Pireno*, it is clear that public adjuster contracts do not play a part in transferring or spreading a policyholder's risk. Also, a public adjuster contract is not an integral part of the policy relationship between the insurer and the insured. Just as in *Pireno*, the public adjuster contract involves an arrangement between one party to the insurance policy, in this case the insured, and a third party. And just as in *Pireno*, the arrangement is a matter of indifference to the insurance company. Whether an insured is represented, and if he is, the particulars of the agreement, are of no concern to the insurance company. The agreement that an insured has with a third party who represents him, whether, as in some cases, it be a public adjuster, or, as in other cases, an attorney, is not a part of the claims adjustment process itself, which involves the relationship and interaction of the insured or his representative with the insurer or its representative. With respect to the third factor, unlike a peer review committee, a public adjuster is not a party wholly outside the insurance industry. The very service offered by a public adjuster is the representation of an insured. Nevertheless, no one factor is conclusive, and consideration of all three factors leads to the conclusion that a public adjuster contract is not a part of the "business of insurance." *Cf. Securities & Exchange Comm'n v. National Securities, Inc., supra* (merger of two insurance companies not part of "business of insurance" even though both companies are entities within the insurance industry).

■ This conclusion is supported by the Unfair Insurance Practices Act's definition of "person" as "any individual, corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyds insurer, fraternal benefit society, beneficial association and any other legal entity engaged in the

business of insurance, *including* agents, brokers and *adjusters ....*" 40 P.S. § 1171.3 (emphasis added). An "adjuster" is commonly understood to be an agent of the insurance company, *i.e.,* the person who represents the company in settling the loss with the insured, *see* Webster's Seventh New Collegiate Dictionary (1965) (adjust: "to determine the amount to be paid under an insurance policy in settlement of (a loss)"). We are inclined to adopt this understanding of "adjuster," for common words are to be construed according to their common usage. 1 Pa.C.S. § 1903(a). As thus understood, "adjuster" excludes the public adjuster, who represents not the company but the insured. Further, it would appear that the Legislature intended this exclusion, for it knew, and knew how to express, the difference between a public adjuster and an adjuster employed by an insurance company; the Public Adjuster Law expressly makes the distinction. *See* 40 P.S. § 301 ("The term 'public adjuster,' as used in this act, shall include every person ... holding himself or itself out to the public, as an adjuster of claims for losses or damages arising out of policies of insurance ... and receiving any compensation or reward for the giving of advice or assistance to the assured in the adjustment of claims for such losses .... The term does not include an agent or employee of an insurance company, association, or exchange, through whom a policy of insurance was written, in adjusting loss or damages under such policy ....").

■ Even if we were to conclude that a public adjuster contract is a part of the "business of insurance", and that a public adjuster is encompassed within the term "adjuster" under the Unfair Insurance Practices Act, still, the Act does not expressly provide nor does it evidence an intent that the regulation of public adjusters thereunder be exclusive.[3] Indeed, the very existence of the Public Adjuster Law,

---

**3.** We, of course, need not decide and therefore express no view on whether the regulation of insurance companies under the Unfair Insurance Practices Act is exclusive, so that insurance companies are not subject to regulation under the Consumer Protection Law. *Cf. Layton v. Liberty Mutual Fire Insurance Co.,* 577 F.Supp. 1 (E.D.Pa.),

which expressly regulated to some extent public adjusters and public adjuster contracts, defeats the argument that any regulation of public adjusters or public adjuster contracts under the Unfair Insurance Practices Act was intended to be exclusive. Further, the recent enactment of a new law setting up a more comprehensive scheme for the regulation of public adjusters and public adjuster contracts, *see supra* note 2, evidences the Legislature's view that at least until that time there did not exist any statute providing such comprehensive regulation that regulation under the Consumer Protection Law would be precluded.

■ The Public Adjuster Law, 40 P.S. § 301 *et seq.*, clearly did regulate public adjusters and public adjuster contracts, but the regulation was limited, and nothing in the Law manifested the intent that the regulation should be exclusive.

The Public Adjuster Law provided that no person could act as a public adjuster within the Commonwealth unless licensed by the Insurance Commissioner. 40 P.S. § 302. The Commissioner was required to issue a license to any applicant whom he deemed "trustworthy and competent," but the Commissioner could not issue a license to anyone with an interest in a salvage business. *Id.* at § 303. Each public adjuster was required to use a form of contract approved by the Commissioner. *Id.* Each public adjuster was required to keep a record of each transaction open to inspection, at all times, without notice, by the Commissioner, *Id.* Each public adjuster was required to execute and deliver to the Commissioner a $5,000 bond. *Id.* at § 304. The bond was conditioned on the public adjuster's compliance with the requirements of the Public Adjuster Law and the public adjuster not embezzling, fraudulently converting to his own use, or, with the intent to use, disposing of any money or property received by him as a public adjuster contrary to the instructions or without the consent of the insured. *Id.* Any person who entered into a contract with

*aff'd,* 725 F.2d 668 (3 Cir.1983) (summary judgment granted for insurance company in suit by insured under Consumer Protection Law; Unfair Insurance Practices Act provides exclusive remedy).

a public adjuster and suffered loss due to the public adjuster's failure to comply with the Public Adjuster Law was permitted to intervene in any action brought by the Commonwealth and have his claim determined, subject to the priority of the claim of the Commonwealth. *Id.* The Insurance Commissioner was required to revoke the license of a public adjuster who violated any provision of the Act, made a material misrepresentation in the application for a license, committed fraudulent practices, or demonstrated his incompetency or untrustworthiness. *Id.* at § 306. The Commissioner in his discretion could also impose fines for violations of the Public Adjuster Law. *Id.* Finally, violations of the Law constituted misdemeanors punishable by fine. *Id.* at § 308.

The Public Adjuster Law contained no provision either stating or implying that the regulation under the Law of public adjusters or public adjuster contracts should be exclusive. *Cf. Koeune v. State Bank of Schuylkill Haven,* 134 Pa.Super. 108, 4 A.2d 234 (1939) (Public Adjuster Law was passed as a police measure to regulate "in some degree" the business of an insurance adjuster as a public calling; it did not prohibit an oral modification of a written public adjuster contract that was on a form approved by the Insurance Commissioner). Rather, it is apparent that the Public Adjuster Law was a licensing statute; it did not purport to set up a comprehensive scheme of regulation of public adjusters or public adjuster contracts, but instead, its remedial and enforcement provisions were limited to providing only for the revocation of license, the imposition of fines, and recovery on the bond. In contrast, the Consumer Protection Law does set up a comprehensive scheme of regulation, encompassing all unfair and deceptive trade practices, and a comprehensive remedial and enforcement scheme, including injunctive relief, the imposition of fines, private recovery, assurances of voluntary compliance, and the forfeiture of the right to do business. *See infra* pp.

——— ——.

■■■■ The fallacy of appellees' argument is to suppose an irreconcilable conflict or inconsistency between the Pub-

lic Adjuster Law and the Consumer Protection Law. *See Appeal of Yerger*, 460 Pa. 537, 333 A.2d 902 (1975) (in absence of manifestly contrary intention of Legislature, two apparently conflicting statutes must be construed so that both are allowed to operate). Under the Public Adjuster Law the Insurance Commissioner was given the authority to approve public adjuster contracts and to license public adjusters. Although a public adjuster was prohibited under the Public Adjuster Law from using a form of contract not approved by the Commissioner, the Law contained no provision regarding the content of the public adjuster contract. There is no inconsistency between the Public Adjuster Law providing for the approval of contracts by the Insurance Commissioner and the Consumer Protection Law providing in part what those contracts must contain. The authority to approve a contract does not imply the exclusive authority to determine the contents of the contract. Similarly, although the Insurance Commissioner was given the authority under the Public Adjuster Law to revoke a public adjuster's license or impose fines, or both, if the public adjuster demonstrated his incompetency or untrustworthiness or committed fraudulent practices, the Law contained no provision defining what constitutes incompetency, untrustworthiness or fraudulent practices. Again, there is no inconsistency between the Public Adjuster Law giving the Insurance Commissioner authority to impose penalties for certain acts and the Consumer Protection Law providing explicitly what some of those acts are. The power to license, revoke a license, or impose a fine does not imply exclusive authority to determine the standards governing the exercise of the power.

Appellees argue that public adjuster contracts necessarily require prompt action to minimize the loss suffered by the insured, and that to allow the three-day cancellation period provided in the Consumer Protection Law would be in conflict with protection of the insured. But the Consumer Protection Law expressly recognizes and provides for the waiver of the buyer's rights under section 7 in emergency situations. If, therefore, prompt action is in fact required

to minimize the loss suffered by the insured, the public adjuster may secure a valid waiver of the insured's right to cancel the contract.

The Commonwealth Court has twice declined to use another statute as the basis of finding the Consumer Protection Law inapplicable. In *Safeguard Investment Corp. v. Commonwealth,* 44 Pa.Commw. 417, 404 A.2d 720 (1979), the court rejected the appellants' argument that the Consumer Protection Law is inapplicable to activities alleged to be unlawful under either the usury statute of 1858 or the usury statute of 1974. The court noted that the 1858 statute was not a comprehensive statute, but simply fixed maximum interest rates and provided a limited right of recovery, while the 1974 statute expressly provided that it was not meant to affect remedies provided in any other act. In *Pennsylvania Bankers Association v. Commonwealth, Bureau of Consumer Protection,* 58 Pa.Commw. 170, 427 A.2d 730 (1981), the court rejected the argument that the Banking Department has exclusive authority to regulate the state banking industry and that therefore the debt collection regulations promulgated under the Consumer Protection Law may not be applied to state chartered banks. The court found no reason why state banks should be exempt from the Consumer Protection Law regulations, although, given the express provision in the Banking Code that "[e]xcept where otherwise specifically provided, the [Department of Banking] shall enforce and administer all laws of this Commonwealth which relate to any institution ...," the court left open for full hearing the issue whether the Banking Department is charged with plenary administration and enforcement of the debt collection regulations.

■ Similarly, we decline to use the Public Adjuster Law as the basis of finding the Consumer Protection Law inapplicable to public adjusters and public adjuster contracts. Rather, we hold that public adjusters and public adjuster contracts were subject to regulation under both the Public Adjuster Law and the Consumer Protection Law. This conclusion is compelled by a comparison of the two statutes, which, as we have discussed, discloses: that the Public

Adjuster Law contained no provision that its regulation of public adjusters or public adjuster contracts should be exclusive; that the Consumer Protection Law clearly encompasses public adjusters and public adjuster contracts; and that the provisions of the two statutes were not irreconcilable.

Although the trial court therefore erred in holding that public adjusters and public adjuster contracts were not subject to the provisions of the Consumer Protection Law, we may nevertheless uphold its order dismissing the complaint for failure to state a claim upon which relief may be granted if the order may be affirmed on any basis. *Commonwealth v. Cunningham*, 471 Pa. 577, 370 A.2d 1172 (1977); *Commonwealth v. Hinton*, 269 Pa.Super. 43, 409 A.2d 54 (1979); *Commonwealth v. Fierst*, 257 Pa.Super. 440, 390 A.2d 1318 (1978). Appellees argued alternatively to the trial court that appellants failed to state a claim because the Consumer Protection Law does not provide a private cause of action for a violation of section 7. This argument, however, is also without merit.

■ Section 2(4) of the Consumer Protection Law defines "unfair methods of competition" and "unfair or deceptive acts or practices." Sixteen different acts or practices are enumerated, and then a seventeenth, which is defined as: "Engaging in any other fraudulent conduct which creates a likelihood of confusion or misunderstanding." Section 2(4) (xvii). Section 3 of the Consumer Protection Law provides that the practices defined in section 2(4) and in the regulations promulgated under section 3.1 are unlawful. Section 9.2 of the Consumer Protection Law creates a private cause of action for any purchaser of consumer goods or services who suffers an ascertainable loss as a result of any practice declared unlawful by section 3. Appellants alleged in Count I of their amended complaint that they had suffered a loss as a result of appellees having engaged in a practice declared unlawful by section *7* of the Consumer Protection Law. That was the same as alleging that appellees had engaged in a practice declared unlawful by section *3*, because, contrary to appellees' argument otherwise, conduct

in violation of section 7 is within section 2(4)(xvii), and therefore within section 3, as "fraudulent conduct which creates a likelihood of confusion or misunderstanding." Section 2(4)(xvii) "was designed to cover generally *all* unfair and deceptive acts or practices in the conduct of trade or commerce." *Commonwealth v. Monumental Properties, Inc., supra,* 459 Pa. at 478, 329 A.2d at 826 (emphasis added).

In addition, we note that the public enforcement provisions of the Consumer Protection Law primarily refer to practices declared unlawful by section 3. *See* 73 P.S. § 201–4 (injunction by the Attorney General or a district attorney for practices declared unlawful by section 3); 73 P.S. § 201–4.1 (order for payment of costs and restitution in connection with permanent injunction under section 4); 73 P.S. § 201–8 (civil penalties for violation of injunction issued under section 4 and for willful use of practices declared unlawful by section 3); 73 P.S. § 201–9 (forfeiture of right to do business for violation of injunction issued under section 4). If, as urged by appellees, section 9.2 were interpreted as not extending to violations of section 7, none of these remedies would be available for a violation of section 7. The only remedies that would be available would be those provided by section 5, which allows the Attorney General to accept an assurance of voluntary compliance, and section 8, which provides for the imposition of civil penalties for the violation of the terms of an assurance of voluntary compliance. We are satisfied that the Legislature did not intend to provide for the enforcement of the provisions of section 7 only through the acceptance of assurances of voluntary compliance.

Accordingly, in Count I of their amended complaint appellants have stated a claim upon which relief may be granted. We shall therefore reverse the order of the trial court insofar as it dismissed Count I, and remand for further proceedings.

–2–

Appellants argue that the trial court also erred in dismissing Count II of their amended complaint for failure to state

a claim upon which relief may be granted. This argument may be summarily disposed of, although on reasoning different from the trial court's. *See Commonwealth v. Cunningham, supra* (order of trial court may be affirmed if supportable on any legal basis).

Count II of the amended complaint alleged violations of the Federal Trade Commission Rule regarding door-to-door sales, 16 C.F.R. § 429, promulgated under the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* It is well-established, however, that there is no private cause of action for violations of the Federal Trade Commission Act, *Alfred Dunhill, Ltd. v. Interstate Cigar Co., Inc.*, 499 F.2d 232 (2d Cir.1974); *Holloway v. Bristol-Meyers Corp.*, 485 F.2d 986 (D.C.Cir.1973); *Carlson v. Coca-Cola Co.*, 483 F.2d 279 (9th Cir.1973). We shall therefore affirm the order of the trial court insofar as it dismissed Count II of appellants' complaint.

The order of the trial court is reversed insofar as it dismissed Count I of the amended complaint, and the case is remanded; the order is affirmed insofar as it dismissed Count II of the amended complaint. Jurisdiction is relinquished.